# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Manuel Ray F. Z.,                                        Case No. 23-cv-03870 (ECW)

          Plaintiff,

v.                                                                          **ORDER**

Leland Dudek,[1]
Acting Commissioner of Social Security,

          Defendant.

_____

This matter is before the Court on Plaintiff Manuel Ray F. Z.'s ("Plaintiff") Brief in Support of Petition for Judicial Review (Dkt. 7) and Defendant Acting Commissioner of Social Security's ("Defendant" or "Commissioner") SSA Brief (Dkt. 9). Plaintiff filed this case seeking judicial review of a final decision by the Commissioner denying his application for supplemental security income ("SSI") benefits.[2] (Dkt. 1.) The Commissioner asks the Court to affirm the Commissioner's decision. (Dkt. 9.) For the

---

[1] The Complaint named Martin O'Malley, who was the Commissioner of the Social Security Administration when Plaintiff filed his Complaint. (*See* Dkt. 1.) Leland Dudek became the Acting Commissioner of Social Security on February 19, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for Martin O'Malley as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

reasons stated below, Plaintiff's request for remand is denied and the Commissioner's decision is affirmed.

## I.    BACKGROUND

Plaintiff filed a Title XVI application for supplemental security income on November 6, 2019, alleging disability beginning August 1, 2007.  (R. 353-362.)[3] Plaintiff's application alleged disability due to severe depression, post-traumatic stress disorder ("PTSD"), panic attacks with agoraphobia, and anxiety disorder.  (R. 381.)  His application was initially denied on February 18, 2020 (R. 228-30), and denied on reconsideration on June 15, 2020 (R. 236-38).  Plaintiff requested a hearing before an administrative law judge ("ALJ") on August 11, 2020.  (R. 239.)  He first had a hearing before ALJ David B. Washington on January 27, 2021 in Minneapolis, Minnesota. During that hearing, Plaintiff amended his disability onset date to November 6, 2019, the date he applied for SSI benefits.[4]  (R. 146-47.)  The case was then transferred, and a second hearing was held before ALJ Stanley Chin on November 15, 2022 in Baltimore, Maryland.  (R. 169.)  ALJ Chin ("ALJ Chin" or "the ALJ")[5] issued an unfavorable

---

[3]    The Social Security Administrative Record ("R.") is available at Docket Entry 5.

[4]    This amendment is not directly reflected in the ALJ's decision, although the ALJ's determination was that Plaintiff had "not been under a disability within the meaning of the Social Security Act since November 6, 2019, the date the application was filed."  (R. 115.)

[5]    The Court refers to ALJ Chin as "the ALJ" since he issued the decision, and to the ALJ who presided over the first hearing but did not issue a decision as "ALJ Washington."

decision on November 22, 2022, finding that Plaintiff was not disabled from the

November 6, 2019 application date through the date of the ALJ's decision.  (R. 111-30.)

Following the five-step sequential evaluation process under 20 C.F.R.

§ 416.920(a)[6] (R. 115-16), the ALJ first determined at step one that Plaintiff had not

engaged in substantial gainful activity since November 6, 2019.  (R. 116.)  At step two,

the ALJ determined that Plaintiff had the following severe impairments: Major

---

[6]     The five steps are as follows:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920(a)(4).

Depressive Disorder, Generalized Anxiety Disorder, PTSD, Panic Disorder with

Agoraphobia, Opioid Use Disorder, and Alcohol Use Disorder.  (R. 117.)

At step three, the ALJ determined that Plaintiff did not have an impairment that

met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1.  (R. 117-19.)  The ALJ considered the criteria of Listings

12.04, 12.06, and 12.15, including whether the "paragraph B" criteria and "paragraph C"

were satisfied, and found they were not.  (R. 117-19.)

At step four, after reviewing the entire record, the ALJ found Plaintiff's residual

functional capacity ("RFC") as follows:

> [T]o perform a full range of work at all exertional levels but with the
> following nonexertional limitations: The claimant is limited to simple and
> repetitive tasks in a routine work setting, performed in a work environment
> with no assembly line work or work that requires hourly quotas, involving
> only simple work-related decisions and infrequent and gradual workplace
> changes. The claimant is limited to no interaction with the public with
> occasional interaction with coworkers and supervisors.

(R. 119.)  In arriving at this RFC, the ALJ found that Plaintiff's medically determinable

impairments could reasonably be expected to cause the alleged symptoms, but that

Plaintiff's statements concerning the intensity, persistence, and limiting effects of his

symptoms were not entirely consistent with the medical evidence and other evidence in

the record.  (R. 120.)

At step five, the ALJ determined that Plaintiff had no past relevant work

experience, was 28 years old—defined as a "younger individual age 18-49"—when his

application was filed, had limited education, and the transferability of job skills was not

an issue because Plaintiff did not have any past relevant work.  (R. 124.)  The ALJ

concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that Plaintiff was capable of performing the requirements of the following representative occupations: dishwasher (DOT #318.687-010), with 107,000 jobs available in the national economy; equipment washer (DOT #381.687-022), with 25,000 jobs available in the national economy; and warehouse worker (DOT #922.687-058), with 20,000 jobs available in the national economy.  (R. 124.)

Accordingly, the ALJ found that Plaintiff was not disabled since November 6, 2019 through the date of the November 22, 2022 decision.  (R. 125.)  Plaintiff requested review of the decision by the Appeals Council on December 30, 2022.  (R. 350-52.) Plaintiff also submitted additional evidence in the form of medical records for the period between November 16, 2022 and November 23, 2022 (R. 131-43), as well as additional evidence in the form of medical records for the period between December 22, 2022 and February 14, 2023 (R. 12-110).  On October 16, 2023, the Appeals Council denied Plaintiff's request for review, stating it did not exhibit the November 16, 2022 to November 23, 2022 evidence because it "does not show a reasonable probability that it would change the outcome of the decision," and found the December 22, 2022 to February 14, 2023 evidence "does not relate to the period at issue" because the ALJ's decision was "through November 22, 2022."[7]  (R. 1-4; *see also* R. 12-143 (medical

---

[7]     Plaintiff does not challenge the Appeals Council's decision not to exhibit the November 16 to November 23, 2022 evidence or finding that the medical records dated December 22, 2022 to February 14, 2023 did not relate to the period at issue.  The Court therefore does not discuss or consider this evidence in this Order.

records).)  The Appeals Council's denial made the ALJ's decision the final decision of the Commissioner.

Plaintiff then commenced this action for judicial review seeking reversal and remand to the Agency for further consideration.  (Dkt. 1.)  The Commissioner filed the administrative record on February 20, 2024 (Dkt. 5), but Plaintiff did not file his brief within 30 days as required under Rule 6 of the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g), prompting the Court to issue an Order to Show Cause (Dkt. 6).  In response to that Order, Plaintiff filed his brief on September 15, 2024 (Dkt. 7), the Commissioner filed a response on October 15, 2024 (Dkt. 9), and Plaintiff filed a reply on November 5, 2024 (Dkt. 10).  The matter is now ready for decision.  The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record in its analysis only when it is helpful for context or necessary for resolution of the specific issues presented by the parties.

## II.    RELEVANT FACTUAL RECORD

### A.    Medical Record Before the ALJ[8]

This summary of the medical record includes some records that predate Plaintiff's November 6, 2019 amended onset date.  Such records are included because they may be

---

[8]    While some of the records were generated in connection with Plaintiff's substance abuse treatment, the ALJ did not rely on any such treatment for purposes of his determination and the parties did not make arguments based on any substance use treatment or diagnoses related to substance use.  The Court includes these records only to the extent they contain observations as to Plaintiff's mental health status and treatment.

relevant to the determination. *See Shilitha C. v. O'Malley*, No. 23-CV-600 (ECW), 2024 WL 626444, at *2 n.4 (D. Minn. Feb. 14, 2024) ("Although SSI benefits are not payable before the month following the month in which the application was filed, medical records before the application date and close to the onset date are potentially relevant to the period for which the claimant may receive benefits.") (citing *A.S.A. v. Saul*, No. 20-CV-74 (ECW), 2021 WL 1062037, at *3 (D. Minn. Mar. 19, 2021), *appeal dismissed*, No. 21-1949, 2021 WL 4959035 (8th Cir. Sept. 15, 2021)); *cf.* 20 C.F.R. § 416.912 (requiring Social Security Administration ("SSA") to develop a claimant's "complete medical history" for at least the 12 months prior to the month the application was filed).

On November 6, 2018, a year before Plaintiff filed the application for SSI at issue in this case, Plaintiff was seen by Joel Stuart Giffin, DO, of United Family Practice Health Center ("UFP"), also referred to as United Family Medicine ("UFM"), because he had run out of suboxone,[9] and to discuss recent stressors in connection with his history of alcohol abuse. (R. 588.) Plaintiff attended the appointment alone. (R. 588.) Dr. Giffin's notes stated that Plaintiff was experiencing stress due to his mother's new cancer diagnosis and losing custody of his daughter, but had no current desire to drink alcohol. (R. 588.) Dr. Giffin referenced past inpatient treatment but noted improvement: "Mood was anxious and depressed and stressed when inpatient but now relieved to be back on Suboxone and sober." (R. 588.) Dr. Giffin observed that Plaintiff had a normal affect,

---

[9]    Suboxone is a medication used to treat addictions or dependence on opioids. *See* Suboxone, Eur. Meds. Agency, https://www.ema.europa.eu/en/medicines/human /EPAR/suboxone#:~:text=information%20on%20Suboxone-,Overview,medical %2C%20social%20and%20psychological%20support (last visited Mar. 20, 2025).

fluent speech, and linear thought content, was "[a]lert, cooperative," and showed no acute distress.  (R. 588.)  He continued Plaintiff on suboxone with a one-month follow-up, "sooner as needed."  (R. 588.)

On November 9, 2018, Plaintiff completed an outpatient therapy session with Nicole Carreon, LMFT, where he talked about his mental health.  (R. 587.)  Carreon listed mental health as one of Plaintiff's stressors and impairments, specifically noting: "Mental Health: Manuel was tearful the entire session and is struggling to leave the house.  'I can't leave, I almost didn't make it to this appointment.'"  (R. 587.)  Carreon also discussed in-home therapy and social work options for Plaintiff "since he's unable to leave most days due to panic and anxiety."  (R. 587 (emphasis omitted).)  She completed a referral for an Adult Rehabilitative Mental Health Services ("ARMHS") worker/in-home therapist to work on Plaintiff's skills since he reported he was unable to leave his house due to panic and anxiety, and also referred Plaintiff to UFM's in-house social worker to discuss potential disability and other benefit options.  (R. 587.)  Plaintiff agreed to schedule an appointment with the social worker and to wait to hear regarding the ARMHS services.  (R. 587.)  Carreon's assessment noted both generalized anxiety disorder and panic disorder with agoraphobia, while also noting a risk of suicide: "Yes, but denied having a specific plan or intent.  Protective factors include his mother, younger brother, and children."  (R. 587.)  Plaintiff denied being a homicidal risk and displayed no self-injurious behavior.  (R. 587.)  And outside of a "depressed, sad" mood, Plaintiff had a well-groomed appearance, wore appropriate attire, had appropriate eye

contact, was cooperative, showed "normal" attention and concentration, and had

organized and reality-based thoughts. (R. 587.)

On November 23, 2018, Plaintiff was seen by Certified Nurse Specialist ("CNS")

Elizabeth Spooner-Falde for medication management. (R. 583.) He attended the

appointment alone. (R. 584.) CNS Spooner-Falde noted she had treated Plaintiff in 2016

for anxiety, panic, and depression and that he was on Prozac,[10] BuSpar,[11] and trazodone[12]

at that time. (R. 583.) She noted that Plaintiff had a history of threatening suicide, but

lacked a plan or the intent to do so. (R. 583.) In regard to his depression and anxiety,

CNS Spooner-Falde noted that Plaintiff's issues had been long-term and unresolved but

were "better" with Prozac treatment. (R. 583.) Plaintiff reported that while he was still

the primary caregiver for his four-year-old daughter, his depression, irritability, and low

energy impaired his ability to "be a [g]ood dad." (R. 583.) He also noted that his anxiety

was still a significant problem after six weeks of taking Celexa[13] and expressed interest in

---

[10]     Prozac is a brand name for fluoxetine, a medication used to treat depression and panic attacks. *See* Fluoxetine, MedlinePlus, https://medlineplus.gov/druginfo/meds /a689006.html (last visited Mar. 20, 2025, 2025).

[11]     BuSpar is a brand name for buspirone, which is used to treat anxiety disorders or symptoms of anxiety. *See* Buspirone, MedlinePlus, https://medlineplus.gov/druginfo/ meds/a688005.html (last visited Mar. 20, 2025).

[12]     Trazodone is a serotonin modulator used to treat depression. It can also be used to treat insomnia. *See* Trazodone, MedlinePlus, https://medlineplus.gov/druginfo/meds /a681038.html (last visited Mar. 20, 2025).

[13]     Celexa is a brand name for citalopram, an antidepressant that is part of the class of medications called selective serotonin reuptake inhibitors ("SSRI"). *See* Citalopram, MedlinePlus, https://medlineplus.gov/druginfo/meds/a699001.html (last visited Mar. 20,

trying alternative medications.  (R. 583.)  Plaintiff reported that he had significant

difficulty with procrastination and sticking to projects of any size.  (R. 583.)

CNS Spooner-Falde identified Cymbalta[14] or Effexor[15] as the most targeted

medications for his anxiety, pain management, and depression, but noted that Plaintiff

had failed a pervious trial of Effexor.  (R. 583.)  Noting there was a drug interaction

between Cymbalta and suboxone that topped the dosage at 60 mgs, CNS Spooner-Faldo

still concluded that "this would be a reasonable intervention for him."  (R. 583.)  She

discussed with Plaintiff the possibility of adding prescriptions of Strattera[16] or

Wellbutrin[17] to help with his daytime sleepiness and issues focusing, paying attention,

and with procrastination.  (R. 584.)  She recommended Plaintiff's prescription of

_____

2025).

[14]    Cymbalta is a brand name for duloxetine, an SSRI used to treat depression and generalized anxiety disorder.  *See* Duloxetine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a604030.html (last visited Mar. 20, 2025).

[15]    Effexor is a brand name of venlafaxine, a medication used to treat depression, generalized anxiety disorder, and panic disorder and is a part of a class of medications called serotonin and norepinephrine reuptake inhibitors ("SNRI").  *See* Venlafaxine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694020.html (last visited Mar. 20, 2025).

[16]    Strattera is a brand name for atomoxetine and is used to treat attention-deficit hyperactivity disorder ("ADHD").  *See* Atomoxetine Capsules, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/20224-atomoxetine-capsules (last visited Mar. 20, 2025).

[17]    Wellbutrin is a brand name for bupropion, a medication used to treat depression.  *See* Bupropion, MedlinePlus, https://medlineplus.gov/druginfo/meds/a695033.html (last visited Mar. 20, 2025).

Remeron[18] be cut to 15 mgs, cut his Celexa prescription in half for four days before stopping, and added a prescription for 30 mgs of Cymbalta.  (R. 584.)  She recommended increasing his Cymbalta prescription to 40 or 60 mgs after reviewing labs on his liver.  (R. 586.)

As to Plaintiff's mental status, CNS Spooner-Falde observed that he appeared anxious, had "somewhat slowed" but normal speech and language, showed normal eye contact, and otherwise presented no abnormal movements or remarkable motor activity.  (R. 584.)  Plaintiff reported that he stayed in his room all day and only "sometimes" showered, and described his mood as "low, low motivation, low energy."  (R. 584.)  He stated he had no interest or pleasure in things, slowed somatic symptoms, and noted that his anxiety and panic were "always a problem."  (R. 584.)  However, Plaintiff reported no feelings of guilt or hopelessness, had no risky or self-injurious behavior, and had no auditory or visual hallucinations, delusions, or paranoid ideations, and otherwise showed an "ok" organization of thought.  (R. 584.)  CNS Spooner-Falde reported Plaintiff as oriented, "reasonably organized and forthcoming," and having appropriate speech and language.  (R. 584.)  Of note, Plaintiff was oriented to time, place, and person, showed intact memory and attention, and had a satisfactory memory and fund or knowledge on gross examination.  (R. 585.)  Plaintiff completed a Patient Health Questionnaire-9

---

[18]    Remeron is a brand name for mirtazapine, an antidepressant.  *See* Mirtazapine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a697009.html (last visited Mar. 20, 2025).

("PHQ-9")[19] and a Generalized Anxiety Disorder assessment ("GAD-7").[20]  (R. 586.)  It appears on the date of this appointment that Plaintiff scored a 20 on the PHQ-9 and a 19 on the GAD-7.  (R. 586.)  The records show past PHQ-9 exams on October 22, 2018 and November 6, 2018 resulted in scores of 13 and 16, respectively.  (R. 585-86.)

Following the appointment, the full list of Plaintiff's prescribed medication included suboxone; Cymbalta; Lasix;[21] Vistaril;[22] Remeron; a multi-vitamin with folic acid; and Protonix.[23]  (R. 584-85.)

---

[19]    The PHQ-9 is a screening test to measure the severity of depression.  It is scored as follows: 0-4, none-minimal; 5-9, mild; 10-14; moderate; 15-19, moderately severe; 20-27, severe.  *See* Patient Health Questionnaire-9 (PHQ-9), Nat'l HIV Curriculum, https://www.hiv.uw.edu/page/mental-health-screening/phq-9 (last visited Mar. 20, 2025).

[20]    The Court understands this assessment to be the Generalized Anxiety Disorder 7-item, or GAD-7, given Plaintiff takes the GAD-7 in later medical appointments and a score of 19 is referenced.  The GAD-7 is a screening test to determine if a patient has generalized anxiety disorder.  The scoring is as follows: 0-4, minimal anxiety; 5-9, mild anxiety; 10-14, moderate anxiety; 15 or greater, severe anxiety.  *See* Generalized Anxiety Disorder 7-item (GAD-7), Nat'l HIV Curriculum, https://www.hiv.uw.edu/page/mental-health-screening/gad-7 (last visited Mar. 20, 2025).

[21]    Lasix is a brand name for furosemide, a medication used to treat high blood pressure.  *See* Furosemide, MedlinePlus, https://medlineplus.gov/druginfo/meds /a682858.html (last visited Mar. 20, 2025).

[22]    Vistaril is a brand name for hydroxyzine, a medication used to help control anxiety caused by nervous and emotional conditions.  *See* Hydroxyzine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/description/drg-20311434 (last visited Mar. 20, 2025).

[23]    Protonix is a brand name for pantoprazole, a heartburn medication.  *See* Pantoprazole Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/ 21005-pantoprazole-tablets (last visited Mar. 20, 2025).

On November 26, 2018, Plaintiff was again seen by Carreon for an outpatient therapy session. (R. 582.) Carreon noted: "Manuel continues to isolate at home every day of the week and sleeps for several hours." (R. 582.) She also noted his legal stress over the custody of his oldest daughter and discussed how his improving sobriety helped with his anxiety. (R. 582.) Plaintiff had an appointment later that day to talk with a social worker. (R. 582.) Carreon again assessed Plaintiff with generalized anxiety disorder and panic disorder with agoraphobia. (R. 582.) Plaintiff again took a PHQ-9 test, resulting in a score of 18, indicating moderately severe depression, and a GAD-7, resulting in a score of 18, indicating severe depression. (R. 582.) Plaintiff's appearance was well-groomed and appropriate. (R. 583.) He was cooperative, with appropriate eye contact. (R. 583.) He displayed normal attention and concentration, had organized and reality-based thoughts, and showed no impairment to his recent and remote memory, despite a depressed and sad mood and a flat affect. (R. 583.) Carreon referred him to ARMHS. (R. 582.)

Later that day on November 26, 2018, Plaintiff met with Mariya Javed, LGSW, LADC. (R. 582.) Plaintiff asked for assistance applying for social security disability insurance and began an application. (R. 582.) Plaintiff also reported having debilitating anxiety and agoraphobia, stating he was "often unable to leave his home because of the anxiety," and that he had used alcohol and other substances to help with those issues. (R. 582.) Javed noted that Plaintiff might benefit from trauma therapy and long-term therapy for anxiety symptoms, stating she would discuss this with him. (R. 582.)

Plaintiff again met with Javed on December 5, 2018.  (R. 580.)  Plaintiff stated that he wanted to continue doing therapy with Carreon and discussed his trauma history and anxiety.  (R. 580.)  Javed "validated" Plaintiff for coming to the appointment despite his anxiety.  (R. 580.)

On December 14, 2018, Plaintiff saw Dr. Giffin in person.  (R. 579.)  Plaintiff attended the appointment with his daughter.  (R. 579.)  Dr. Giffin noted that Plaintiff had seen CNS Spooner-Falde and was taking an increased duloxetine (Cymbalta) dose of 60 mgs and 50 mg of hydroxyzine (Vistaril) twice a day.  (R. 579.)  Plaintiff reported that an ARMHS worker was coming to his house every week.  (R. 579.)  Dr. Giffin described Plaintiff as alert, cooperative, and showing no acute distress, with a normal affect, fluent speech, and linear thought content.  (R. 580.)

On January 14, 2019, Plaintiff called to inform Dr. Giffin that he would be unable to attend an appointment that day due to his daughter having urgent heart surgery.  (R. 578-79.)  Dr. Giffin called Plaintiff back and later stated: "He's been depressed. Struggling to get out of bed some days."  (R. 579.)  Plaintiff reported that he wanted to restart talk therapy and social work, which Dr. Giffin encouraged.  (R. 579.)  Dr. Giffin noted Plaintiff's continued sobriety and that he had less anxiety.  (R. 579.)

Javed met with Plaintiff on January 17, 2019.  (R. 577.)  While Plaintiff was alert, she described his affect as depressed and anxious, and his mood as depressed, anxious, and angry, although Plaintiff denied any suicidal or homicidal risk and any self-injurious behavior.  (R. 577-78.)  Javed noted the following:

14

> Patient reports he has been struggilng [sic] the last month and completely
> shut down-he was not able to leave his house much due to anxiety and
> agoraphobia and depression. His daughter has to have heart surgery next
> month-to get a pacemaker [sic]-he has been very worried and anxious about
> this. Reports he cries everyday and then feels really drained. . . . Reports
> being overwhelmed, crying, worried, anxious, and angry about his life
> circumstances. He feels stuck. Writer worked on problem solving his
> situation-realizes that it is very hard for him to go to appointments or talk on
> the phone due to anxiety. Commended him for coming to this appointment
> today. . . . Writer practiced some mindfulness with the patient-encouraging
> him to become more aawre [sic] of his anger and notice what he does with it.
> This seemed to be difficult for him to sit still and allow himself to have
> emotions. Discussed strengths-where he feels strong. He was somewhat able
> to connect to this. Patient appears to have great difficulty managing his
> anxiety and depression and gets caught in a cycle of avoidance that creates
> more anxiety.

(R. 578.)  Javed recommended that Plaintiff enter day treatment for his mental health, and

Plaintiff was open to that idea.  (R. 578.)

Javed again met with Plaintiff on January 25, 2019.  (R. 576.)  Plaintiff had an

oriented, distractible, and interrupting sensorium; a depressed, sad, and anxious affect;

and a depressed and anxious mood.  (R. 577.)  He reported no suicidal or homicidal risk

and no self-injurious behavior.  (R. 577.)  Javed stated:

> [Plaintiff] came in today and was extremely tearful throughout the session.
> His daughter has to have open heart surgery-he is really struggling with fears
> around losing her. Reports he has hardly been able to eat or get out of bed
> the past few days. [Plaintiff] reports he is feeling completely overwhelmed
> with the legal system too-he has court on Monday and was not able to fill out
> the paperwork that he needed to because it was too difficult to understand
> (regarding child support).

(R. 577.)  Plaintiff also told Javed that he would not be able to go to day treatment until

his daughter recovered but was worried that he would be penalized by the court system

for not going to treatment.  (R. 577.)  Javed worked with Plaintiff on mindfulness, deep

breathing, and trying to redirect his thinking from drastic thoughts about his daughter toward being present.  (R. 577.)

On February 12, 2019, Plaintiff had a visit with Dr. Giffin.  (R. 575.)  Plaintiff reported that his daughter had undergone surgery eight days prior and spent four days in the hospital before returning to her mother's house.  (R. 575.)  Plaintiff showed stress about his legal issues and his relationship with his daughter's mother in general, who he said limited the amount of time Plaintiff could see his daughter.  (R. 575.)  Plaintiff stated: "I know that I need lots of mental health help."  (R. 575.)  He reported crying every day "at the drop of a hat" and that his sleep was always poor.  (R. 576.)  Plaintiff wondered if he should see a different psychiatrist.  (R. 576.)  Dr. Giffin concluded that Plaintiff had panic disorder with agoraphobia, as well as recurrent major depressive disorder.  (R. 576.)  Plaintiff met with Javed later that day, where he reported that he was seeing his ARMHS worker that Friday, as she had rescheduled several times, and he was open to day treatment in a few weeks once his daughter had recovered.  (R. 575.)  Plaintiff was to schedule a follow-up with Javed the next week to discuss how his ARMHS meeting went and his attempts to get other mental health services set up.  (R. 575.)

Javed met with Plaintiff again on March 7, 2019.  (R. 573.)  His daughter accompanied him to the appointment as she was now staying with Plaintiff fulltime.  (R. 574.)  Plaintiff stated his anxiety had increased since his daughter had begun staying with him and he was concerned about returning to prison following an upcoming court date.  (R. 574.)  Javed "[p]rocessed his black and white, catastrophic thinking-that likely his

16

anxiety is making things seem worse than they actually are or will be." (R. 574.)  Javed

described Plaintiff's sensorium as oriented, affect and mood as sad and anxious, but

noted no suicidal or homicidal risk or self-injurious behavior.  (R. 574.)  Plaintiff

reported he was now working with an ARMHS worker.  (R. 674.)  Javed diagnosed

Plaintiff with panic disorder with agoraphobia and major depressive disorder.  (R. 574.)

On March 14, 2019, Plaintiff was seen by Jonathan Ross Dickman, MD, relating

to his sobriety.  (R. 572.)  Plaintiff reported to Dr. Dickman: "I am still not progressing

. . . I can't go out without crying" and became emotional when having difficulty

providing a urine sample the day of the appointment.  (R. 572.)  He expressed to the

doctor that he was "down for all of it" in regard to undergoing "brain spotting."[24]  (R.

572.)  Plaintiff made mention of a car crash in 2017—"I was in so much pain"—which

provided him prescription medication that later caused him to buy the drugs off the street.

(R. 572.)  Dr. Dickman believed that Plaintiff had been drinking prior to the appointment

because he smelled of alcohol, although Plaintiff said he did "'not feel happy' despite

being sober and mentioned that 'things were better when I drank.'"  (R. 573.)  Dr.

Dickman also stated that Plaintiff had avoidant eye contact and was emotional and

crying.  (R. 573.)  Dr. Dickman instructed Plaintiff that he could get a suboxone renewal

only after he provided a urine sample.  (R. 573.)  Plaintiff reported that he was trying to

---

[24]    Brainspotting is a brain-body alternative therapy treatment that uses eye
positioning to process emotions and trauma.  *See* Feeling Stuck? Brainspotting May Help,
Cleveland Clinic (June 20, 2024), https://health.clevelandclinic.org/brainspotting-
therapy-and-how-it-works (last visited Mar. 20, 2025.)

get social security, was not currently working, and was going to court for child support issues.  (R. 572.)

Javed met with Plaintiff later that day for 10 minutes at Dr. Dickman's request. (R. 572.)  Plaintiff was tearful in the meeting, reported experiencing panic, and was concerned that Dr. Dickman would not renew his suboxone prescription without a urine analysis.  (R. 572.)  Javed described a smell of alcohol coming from Plaintiff.  (R. 572.) Javed tried to calm him down and give him water, allowing him to wait before giving a urine sample.  (R. 572.)  Dr. Dickman came into the room and told Plaintiff he could leave a sample with the lab the next month if he needed to.  (R. 572.)  This caused Plaintiff to become upset and walk out of the appointment, despite Javed's attempt to deescalate the situation.  (R. 572.)  The next day on March 15, 2019, a member of UFM staff reported that Plaintiff never returned to leave a urine sample.  (R. 571.)

On April 10, 2019, Plaintiff arrived at the emergency department and completed a mental health intake with Scott Ward Donner, MD.  (R. 567.)  Plaintiff complained of suspected alcohol withdrawal and reported that he was not using opioids, but he had been drinking again (but not in the last 24 hours).  (R. 568.)  He stated he had been going through "a lot" due to his daughter's recent open-heart surgery, was "very" depressed and more depressed than usual, and simply "want[ed] help."  (R. 568.)  Plaintiff stated he had not been taking his anxiety and depression medications for a few days due to running out and not refilling his prescriptions but denied any suicidal or homicidal ideations.  (R. 568.)  Dr. Donner described Plaintiff as oriented to person, place, and time, in no distress, alert, and as having intact judgment and insight despite a depressed mood.  (R. 569-70.)

18

Plaintiff reported that an ARMHS worker came to his house every week and was helping with his application for social security benefits.  (R. 568.)

Several medical personnel, including Dr. Giffin, corresponded between April 15 and April 22, 2019 about getting Plaintiff admitted to inpatient alcohol abuse treatment.  (R. 566-67.)  However, on April 26, 2019, Plaintiff called requesting a refill of suboxone because his medication had been taken while he was "in jail," causing confusion about whether Plaintiff had been or was still in inpatient treatment.  (R. 565.)

On May 24, 2019, Plaintiff called and spoke to Andrea Seal, RN, seeking a renewal of his Cymbalta and Remeron prescriptions.  (R. 562, 564.)  The notes reference two more PHQ-9 test results, one scoring 22—severe—from February 12, 2019, and the other scoring 19—moderately severe—from March 14, 2019.  (R. 563-64.)  Nurse Seal sent one month's worth of Cymbalta to Plaintiff.  (R. 565.)  Staff followed up with Plaintiff to discuss being seen again for the Remeron renewal.  (R. 563-64.)  Michael Hoyt, RN, spoke to Plaintiff's mother who stated that Plaintiff was doing poorly and had not been taking medication recently, despite her advice otherwise, because he was "too depressed to do much of anything."  (R. 563-64.)  Nurse Hoyt thought a one-month refill "may be the best option to get [Plaintiff] back to clinic," and CNS Spooner-Falde authorized the refill but indicated she would not authorize any further refills until Plaintiff was seen.  (R. 564.)

Plaintiff arrived at the emergency department on June 18, 2019 complaining of suboxone and alcohol withdrawal and was admitted to the hospital for four days before being discharged on June 22, 2019.  (R. 537-62.)  Upon arriving at the emergency

department, he was seen by Noah Maddy, MD, who described him as conversant and alert. (R. 539.) Megan Schmidt, MD, later noted on June 19, 2019 that Plaintiff had been in inpatient treatment for about two weeks, but had left prematurely when his friend had died and because his daughter was ill. (R. 542.) She also states: "Positive for depression and substance abuse. Negative for suicidal ideas. The patient is nervous/anxious." (R. 542.) Notes from Dr. Schmidt on June 19, 2019 described Plaintiff as having a flat affect, depressed mood, and focused on his friend's death and daughter's heart surgery. (R. 544.) Amy Bluedorn, LGSW, ACM described Plaintiff later that day as alert, oriented, engaging, and stated that Plaintiff answered questions, but also described Plaintiff as ill appearing, tremulous, and tearful at times. (R. 548.) Plaintiff reported drinking up to 1 liter of vodka a day for the past few weeks. (R. 548.) He reported to Matthew O'Meara, PharmD, that he was taking suboxone differently than prescribed because he was trying to wean himself off it. (R. 546.)

Sharron Fleming, MD, described Plaintiff the next day as: "Constricted affect, mood 'depressed,' focused on friend's death and daughters [sic] heart surgery." (R. 551.) On June 21, 2019, Plaintiff reported to Dr. Fleming that he was feeling emotional and stressed after a visit from his brother earlier that day, who had started drinking again. (R. 554.) Plaintiff wanted to restart buprenorphine.[25] (R. 554.) Plaintiff's mental status exam results were the same as the day before. (R. 554.)

---

[25] Buprenorphine is a medication used to treat opioid dependence by preventing withdraw symptoms. Buprenorphine Sublingual and Buccal (Opioid Dependence), MedlinePlus, https://medlineplus.gov/druginfo/meds/a605002.html (last visited Mar. 20, 2025).

On June 26, 2019, Plaintiff sought another taper schedule for his suboxone so he could return to inpatient treatment.  (R. 536.)  In a visit with Javed on the same day, he "report[ed] that he was in treatment, then couldn't focus because his friend passed away," causing him to leave treatment and resume drinking.  (R. 536.)  He "then accidentally shot someone when he was drinking, which he feels horrible about."  (R. 536.)  Plaintiff said he was "then hospitalized he said due to falling down the stairs and getting a dog bite."  (R. 536.)  He had been sober for eight days.  (R. 536.)

Plaintiff saw Dr. Giffin on August 12, 2019.  (R. 534.)  Plaintiff reported that he had completed the inpatient treatment program and then left to live with his brother and mother.  (R. 534.)  He had been sober from opioids for about a year and his more recent struggles had involved alcohol.  (R. 534.)  During treatment, Plaintiff's medications were changed, with his Cymbalta dose increased to 90 mg while adding 80 mg of Strattera and 1 mg of Prazosin,[26] with Plaintiff saying he liked the medications and thought they were helping.  (R. 535.)  Overall, Plaintiff stated his mood was better after getting out of treatment.  (R. 535.)  Plaintiff had a normal affect, fluent speech, and linear thought content.  (R. 535.)  The notes also show that Plaintiff was still on his prescriptions of Remeron and Vistaril and was taking Prazosin for PTSD.  (R. 535.)

During medical visits with Matthew D. Haugen, MD, on September 26, 2019 and October 24, 2019 related to Plaintiff's suboxone prescription, Plaintiff was "alert and

---

[26]    Prazosin is a medication to treat high blood pressure.  It is sold by the brand name Minipress.  *See* Prazosin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682245.html (last visited Mar. 20, 2025).

oriented times three," had appropriate affect and mood, and fluent and linear speech. (R. 530, 532.) He told Dr. Haugen during the October 24, 2019 visit that he was working on his social security application with a lawyer. (R. 530.)

During an October 29, 2019 visit with Javed, Plaintiff was oriented but anxious. (R. 529.) Javed observed that Plaintiff's mental health had "improved." (R. 529.) Plaintiff reported still struggling with agoraphobia and anxiety but wanted to visit weekly to work on his anxiety and "become more functional." (R. 529.) He was working with a legal aid clinic to obtain disability benefits. (R. 529.) Javed gave Plaintiff resources for YouTube videos dealing with PTSD and trauma. (R. 529.)

On November 6, 2019, Plaintiff filed his application for SSI benefits. (R. 353-362.)

On November 12, 2019, Plaintiff had a visit with Madeline Peters, a medical student supervised by Dr. Giffin. (R. 633-36.) The notes indicated: "He takes cymbalta, vistaril, mirtazapine, and prazosin for his mood/sleep. He thinks the prazosin really helps with nightmares/flashbacks, Remeron really helps with sleep. Cymbalta helps with depression." (R. 634.) Plaintiff was continued on Remeron and Cymbalta for his major depressive disorder, with his Remeron dose increased to 15 mg a night. (R. 635-36.) Peters noted Plaintiff had "significant PTSD symptoms" and continued him on the Prazosin. (R. 635.) Plaintiff reported that lawyers were helping him with his application for social security benefits and he was hopeful. (R. 634.)

On November 20 and 21, 2019, Plaintiff met with Sagal Ibrahim, LSW, to discuss applying for food benefits. (R. 632-633.) Plaintiff reported the following symptoms relating to his mental health:

> [S]ad, not doing anything Enjoyable, overwhelmed, a lot less energy, Sleeping too much, nightmares, habits or rituals you must do to quiet anxiety, low self-esteem, Racing thoughts, excessive anxiety and worry, panic attacks, easily startled always looking over your shoulder,, restless, flashbacks, problem with confusion, isolated, easily frustrated, feeling empty inside, feeling unable to socialize normally, poor attention memory problems, cant concentrate or focus, procrastination, and eating too much.

(R. 633 (errors in original).) He also noted the medication he was taking had been helpful for the symptoms of panic attacks, anxiety, and a little bit of depression. (R. 633.) Sagal noted Plaintiff had been hospitalized in the past for suicidal reasons, but had never attempted suicide or had been committed for his mental health. (R. 633.) Plaintiff had no concerns about being able to attend scheduled appointments in the future. (R. 633.)

On November 25, 2019, Plaintiff was seen by Thomas Butler, MA, LADC. (R. 631.) His mood was appropriate. (R. 631.) At the time, Plaintiff was stressed about his homeowner's insurance and that his daughter was spending the night at her mother's house. (R. 631.) The two talked about self-care and Plaintiff expressed an openness to beginning brainspotting. (R. 631.) Plaintiff reported that he needed "the/a recommendation sheet from his [primary care physician] that speaks to him not being able to work currently." (R. 631.) Butler diagnosed Plaintiff with alcohol abuse and major depressive disorder, but made no diagnosis relating to anxiety or PTSD. (R. 631.) The plan was for them to visit on an "as needed basis." (R. 631.)

23

Plaintiff saw Butler on December 4, 2019.  (R. 630.)  Plaintiff reported feeling down about an upcoming court date and lawsuit being filed against him.  (R. 630.) Plaintiff also "reported having little pleasure in doing anything and having no energy, not being able to stop worry [sic] and becoming irritable and easily annoyed; reports this is how he feels everyday [sic]."  (R. 630.)  Plaintiff also reported that "he isolates and perseverates most days which triggers his depression and opiate cravings."  (R. 630.) Butler described Plaintiff as oriented with an appropriate mood and affect.  (R. 630.)

Plaintiff saw Dr. Giffin again on December 13, 2019.  (R. 629.)  Plaintiff reported as to his anxiety that "overall he is happy with things," that "things are going my way for the first time ever," and that "it feels good to have things go my way."  (R. 629.)  He also mentioned feeling good about working with a lawyer on his disability process.  (R. 629.) Plaintiff again exhibited a normal affect, fluent speech, and linear thought content.  (R. 629.)  Plaintiff reported that his days were full with taking care of his daughter and "appointments during the day."  (R. 629.)  Dr. Giffin noted that Plaintiff had an appointment with psychiatry later that month to help with anxiety and support his disability case.  (R. 629.)

On December 31, 2019, Plaintiff was seen by CNS Spooner-Falde for a psychiatric evaluation.  (R. 622.)  He arrived 10 minutes late.  (R. 622.)  Plaintiff reported no difficulty falling asleep, but had ongoing excessive feelings of guilt, a lack of energy, poor concentration, excessive worries, and feelings of nervousness.  (R. 626.)  He was casually dressed and groomed, pleasant, and cooperative.  (R. 625.)  His speech was spontaneous, logical and coherent, of a mostly normal rate and tone, non-pressured,

organized, and reasonably responsive to interview questions. (R. 625.) His mood was primarily depressed and anxious" but he was "less dysphoric and feeling more optimistic." (R. 625.) His affect was appropriate to content of speech and circumstances. (R. 625.) Plaintiff completed a PHQ-9 resulting in a score of 18, an anxiety screen of 19,[27] and a Global Assessment of Function ("GAF") score of 50.[28] (R. 627.) His motivation appeared better. (R. 626.) Plaintiff was using marijuana twice a week and was aware that it could make his anxiety worse. (R. 627.) He was interested in trying Wellbutrin and therapy and began a plan to stop smoking tobacco and marijuana. (R. 628.) CNS Spooner-Falde recommended starting Wellbutrin and a "happy light" for seasonal affective disorder. (R. 628.)

Plaintiff had a clinic visit with Dr. Giffin on January 13, 2020. (R. 621.) Plaintiff reporting having a stressful event with his daughter's mother that caused him to cry a lot, but he "got over it" and was relieved by his strength and ability to cope without alcohol. (R. 621.) The notes as to anxiety again indicate "overall he is happy with things," and that Plaintiff said "things are going my way for the first time ever" and "it feels good to

---

[27]      The notes do not specify which type of anxiety screen was taken by Plaintiff.

[28]      The Global Assessment of Functioning is "a scoring system for the severity of illness in psychiatry." IH Mondrad Aas, Guidelines for Rating Global Assessment of Functioning (GAF), Nat'l Lib. of Med. (Jan. 20, 2011), https://pmc.ncbi.nlm.nih.gov/ articles/PMC3036670 (last visited Mar. 20, 2025). The 41 to 50 range of the GAF is described as: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* Global Assessment of Functioning (GAF) Scale, Int'l Assoc. of Analytical Psychology, https://iaap.org/wp-content/uploads/2023/04/GAF-Scale.pdf (last visited Mar. 20, 2025).

have things go my way." (R. 621.) He told Dr. Giffin that he had a psychological evaluation in about 10 days in connection with his disability application. (R. 621.) His affect was normal and he was alert, cooperative, and in no acute distress. (R. 621.) Dr. Giffin prescribed Seroquel[29] for anxiety and sleep and refilled Plaintiff's Vistaril and suboxone prescriptions. (R. 622.)

On March 16, 2020, Nurse Hoyt entered a note stating that Prime Therapeutics had sent a letter indicating that Plaintiff may not have been taking his Prazosin medication as prescribed.[30] (R. 618.)

Butler saw Plaintiff on April 30, 2020. (R. 780.) Butler reported Plaintiff to be "very tearful when explaining how hard life has been for him," and was "struggling more than ever" due to the confluence of Covid-19 side effects with his sobriety. (R. 780.) Plaintiff was again oriented and had an appropriate affect and mood. (R. 780.) He again

---

[29]     Seroquel is a brand name for quetiapine, an antipsychotic medication used to regulate mood, behaviors, and thoughts for those with mental health conditions by balancing dopamine and serotonin in the user's brain. *See* Quetiapine Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/19288-quetiapine-tablets (last visited Mar .20, 2025).

[30]     The medical records indicate Plaintiff had a telephone visit with Butler on March 26, 2020, during which Plaintiff reported struggling with his sobriety and that he had been using for at least two weeks. (R. 781-83; *see also* R. 616-17 (same visit).) Plaintiff testified during this hearing that this record must be for his brother. (R. 159-60.) The ALJ did not rely on these records in the decision and the Commissioner does not dispute that these records are not Plaintiff's. The Court notes Butler stated he was treating Plaintiff's brothers as well as Plaintiff in his January 29, 2021 letter (R. 790) and that Dr. Giffin referred to Plaintiff by his brother's first name in another medical record (R. 630). The Court therefore does not rely on the March 26, 2020 medical record for purposes of this Order.

26

expressed openness to brainspotting and "delving into some of the trauma that is creating these low moods, and anxiousness." (R. 780.)

Plaintiff again met with Butler on May 1, 2020. (R. 778.) Plaintiff was oriented and had appropriate affect, but Butler noted a depressed mood. (R. 778.) Plaintiff was very emotional as they started his brainspotting therapy. (R. 778.) Plaintiff wanted to work on feelings of shame associated with his thoughts that his daughter looks at him like a "bum" due to his issues. (R. 778.) Plaintiff also talked about how traumatic it was shooting his friend and how he could have been imprisoned for a long time due to the shooting. (R. 778.) He was amenable to Butler's suggestions about how living in the past would only hinder his therapy. (R. 778.)

Plaintiff saw Butler on June 8, 2020. (R. 776.) Plaintiff was oriented with a flat affect and depressed mood. (R. 776.) Plaintiff was guarded when Butler attempted to revisit past topics but was less tearful and more alert. (R. 776.) Plaintiff told Butler that he thought his Lexapro[31] prescription was working and was "hopeful." (R. 776.) He inquired about a cannabis prescription. (R. 776.)

Plaintiff next visited with Butler on September 23, 2020. (R. 774-75.) Plaintiff was feeling anxiety about potential mistreatment of his daughter at his daughter's mother's house and was feeling helpless. (R. 775.) He reported difficulty living with his mother, as his two brothers were still actively using and had been coming in and out of

---

[31]    Lexapro is a brand name for escitalopram, an SSRI used to treat depression and generalized anxiety disorder. *See* Escitalopram, MedlinePlus, https://medlineplus.gov/druginfo/meds/a603005.html (last visited Mar. 20, 2025).

the house all week.  (R. 774.)  Plaintiff was oriented and had an appropriate affect and

mood.  (R. 774.)  He reported having "some agitated thoughts recently."  (R. 775.)  The

plan was for Plaintiff to continue seeing Butler as needed.  (R. 775.)

Plaintiff saw Butler by telemedicine on October 13, 2020.  (R. 772.)  He was

oriented with an appropriate affect, but a depressed mood.  (R. 773.)  They focused on his

continued low moods, struggling family, and his recovery.  (R. 773.)  Plaintiff was not

well and thought he might have Covid-19.  (R. 773.)  He reported continued sobriety. (R.

773.)  The plan was for Plaintiff to continue seeing Butler as needed.  (R. 773.)

On October 27, 2020, Plaintiff expressed to Butler during a face-to-face visit that

he was upset about his cat passing away.  (R. 770-71.)  Plaintiff stated his anxiety had

been bad and he did not feel like he could attend jury duty.  (R. 771.)  Butler wrote a note

to the court a note asking that Plaintiff be excused on grounds of a mental illness.  (R.

771.)  Plaintiff was again oriented with an appropriate affect and mood.  (R. 771.)  The

plan was for Plaintiff to continue seeing Butler as needed.  (R. 771.)

On November 17, 2020, Plaintiff told Butler that he felt his depression was taking

a turn for the worse due to watching his brothers struggle with alcohol.  (R. 769.)

Plaintiff was oriented with an appropriate affect and mood.  (R. 769.)  The plan was for

Plaintiff to continue seeing Butler as needed.  (R. 769.)

On January 19, 2021, Butler completed a Mental Residual Functional Capacity

Assessment for Plaintiff.  (R. 784-87.)  Butler wrote that Plaintiff had begun treatment on

January 14, 2015, and that Plaintiff received treatment on a bi-weekly basis.[32] (R. 784.) The form states Butler had last seen Plaintiff on January 18, 2021 (R. 784) but there is no record of this visit.[33] Butler listed Plaintiff's diagnoses as panic disorder with agoraphobia; PTSD; and major depressive disorder, along with medical problems per his past medical history and psychosocial stressors-serious and persistent mental health. (R. 784.) He listed Plaintiff's current GAF as 45 or 46, with his highest score being between 40 and 45 that year. (R. 784.) Butler asserted that Plaintiff's prognosis was poor. (R. 784.) He stated that Plaintiff had undergone psychiatric and psychological treatments along with medication management. (R. 784.) He expected Plaintiff's impairment to last at least 12 months and did not believe Plaintiff was a malingerer. (R. 784.) He also opined that Plaintiff showed no current evidence of drug or alcohol abuse and that Plaintiff was compliant with his treatment. (R. 785.)

Butler assessed Plaintiff to have at least marked limitations in all areas of the assessment, including circling "marked" in the instruction portion before the individual questions. (R. 785.) He circled "marked" for each of the three questions relating to Plaintiff's understanding and memory. (R. 785.) He circled "extreme" for seven of the eight questions relating to sustained concentration and persistence, only circling

---

[32]    It is unclear if Butler meant that he began treating Plaintiff in January 2015 or that Plaintiff's treatment with UFM began at that time. If Butler meant he personally began treating Plaintiff if January 2015, that does not appear to be consistent with the medical record. Further, Plaintiff testified that he attended therapy sessions with Butler for two years, from 2019 to 2021. (R. 183.)

[33]    Plaintiff did see PA Brothers by telehealth (audio only) on January 21, 2021. (R. 823-26.)

"marked" for "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (R. 785-86.) He circled "extreme" for each of the five social interaction questions. (R. 786.) He also circled "extreme" for four of the five questions relating to adaption, excluding a "marked" assessment for "[t]he ability to be aware of normal hazards and take appropriate precautions." (R. 786-87.) Butler also stated that Plaintiff's impairments would substantially interfere with his ability to work at least 20% of the time and projected that Plaintiff would need to miss work 30 days per month due to his impairment. (R. 787.)

Butler concluded by stating that Plaintiff's diagnoses "inferfere[] with the majority of [Plaintiff's] functioning." (R. 787.) He also stated Plaintiff lacked the ability to manage his own funds and explained that it was because Plaintiff was "currently living with his mother due to his inability to work." (R. 787.)

On January 21, 2021, Plaintiff was seen for a telehealth appointment with Dawn Brothers, PA, for a suboxone refill. (R. 823.) PA Brothers' notes indicate that Plaintiff was working with lawyers on social security benefits, was meeting with "IBH" ("integrated behavior health") at UFM on a regular basis, was starting to exercise, had a stable mood, and "[f]eels supported." (R. 823-24.)

On February 1, 2021, Plaintiff's attorney submitted a letter from Butler "to clarify several issues that arose during the medical testimony" during the first hearing (before ALJ Washington). (R. 788-90.) Butler stated that Plaintiff had been in recovery for two years and that he saw Plaintiff's two brothers, along with Plaintiff, and all three struggled with chemical dependency and mental health issues. (R. 790.) Butler further stated:

Due to Manuel getting sober and beginning his recovery, his coping mechanism (substances) has been taken away from him and he is now forced to deal with the traumas of his past by only challenging them "head-on" as seen by therapy and trying to self-soothe, and in doing so Manuel's mental health has deteriorated over the last year even with regular therapy and emotional support.

Panic attacks and extreme anxiety are not uncommon for those with co-occurring disorders (simultaneous mental health and substance use disorders) which hinder their quality of life significantly. Manuel's depression/anxiety/panic has limited him from even spending quality time with his daughter (which is his biggest motivation in life) as seen by his compulsion to isolate and avoid social situations due to extreme anxiety and hopelessness. In regard to returning to work, forcing Manuel to find work would only be setting him up for failure and more hardships. In this writer's opinion, Manuel would not be able to work any consecutive days in a row without having a behavioral health issue which would ultimately lead to his dismissal again and again.

(R. 790.)

On February 19, 2021, Plaintiff was again seen by PA Brothers virtually. (R. 820-21.) PA Brothers noted that Plaintiff was having some anxiety, including as it related to the results of his social security hearing, but was otherwise "well appearing" and showed "no acute distress." (R. 821.) He had been "[s]eeing IBH, but not recently," and was working on using a treadmill. (R. 821.)

Plaintiff was seen by Tegan Presley, PA, on March 17, 2021 to discuss his substance use. (R. 816.) Plaintiff reported recent stress relating to court and social security, which "did not go well," resulting in "[h]aving more depression, panic with these pending results," but he was spending "lots of time" with his daughters. (R. 816.) PA Presley noted that Plaintiff's behavioral interventions included IBH at UFM. (R. 816.) PA Presley observed Plaintiff to be well appearing, in no acute distress, and that he

was alert and conversant, with a normal affect.  (R. 818.)  PA Presley assessed:

"Recommend continue antidepressants and as needed Seroquel for panic.  Encouraged

more behavioral interventions."  (R. 818.)

On May 4, 2021, Plaintiff again was seen by PA Presley for medication

management.  (R. 810.)  Plaintiff reported more stress with court and social security,

specifically more court that was upcoming regarding child support.  (R. 810.)  PA Presley

also noted that while his behavioral interventions included IBH at UFM, they were "not

often."  (R. 810.)  PA Presley noted Plaintiff gets "hives" or "welts" on his hands and

fingers when stressed, which he had managed with hydrocortisone with some

improvement.  (R. 810.)  PA Presley wrote:

> Feels he is not social, no desire to go out and do social activities. This
> includes activities he has planned. When people come to the house, he avoids
> interacting. He describes himself as an introvert, but his avoidance is not
> consistent with his introvert status, rather he is afraid to leave the house / be
> social. Feels he was only able to be social while using.

(R. 810.)  PA Presley again observed Plaintiff to be well appearing and in no acute

distress, as well as alert and conversant with a normal affect.  (R. 812.)  She

recommended "more intense therapy" as well as that Plaintiff follow up with "Tom

[Butler]" and consider cognitive behavioral therapy.  (R. 813-14.)  She also prescribed a

topical gel for his hives/welts.  (R. 814.)

Plaintiff was seen by PA Presley for medication management on June 9, 2021.  (R.

805.)  PA Presley wrote: "Doing well.  Now playing softball in sober league with his

brother.  This is highly anxiety provoking, but it is getting easier."  (R. 806.)  PA Presley

observed Plaintiff to be well appearing, in no acute distress, alert and conversant, and

with a normal affect.  (R. 807.)  She recommended "more intense therapy" and for Plaintiff to "[c]ontinue to pursue community and connection."  (R. 808.)

At a medication management appointment with PA Presley on July 16, 2021, Plaintiff reported that he had paused playing softball, had anxiety about needing to get dental work done, and that his younger brother had relapsed.  (R. 800-01.)  The record reflects a PHQ-9 score of 21, indicating severe depression, from June 4, 2021.  (R. 801.)  Plaintiff was again well appearing, showed no acute distress, was alert and conversant, and had a normal affect.  (R. 802.)  PA Presley assessed: "Patient has severe PTSD, anxiety and the dental work necessary is causing him distress."  (R. 803.)  His prescriptions included Remeron, seroquel, Lexapro, hydroxyzine, and prazosin.  (R. 801.)

Plaintiff had an office visit with PA Presley on September 3, 2021.  (R. 795-96.) PA Presley noted that Plaintiff continued to be anxious about his need for dental work and that he needed to arrange "medical rides."  (R. 796.)  Plaintiff was again well appearing, showed no acute distress, was alert and conversant, and had a normal affect. (R. 797.)

A visit on October 1, 2021 with PA Presley related to Plaintiff's substance use disorder did not include any complaints as to Plaintiff's mental health.  (R. 791-95.) Plaintiff was noted to be alert and oriented times three.  (R. 793.)

On both November 5 and December 3, 2021, Plaintiff met with PA Presley for medication management by telemedicine, showing interest in quitting smoking and complaining of a headache.  (R. 827, 833.)  PA Presley observed that Plaintiff had a depressed affect but showed appropriate eye contact and speech.  (R. 829, 835.)  The

November 5, 2021 appointment notes updated Plaintiff's behavioral interventions to "none." (R. 827.)

Plaintiff met with PA Presley again on February 7, 2022. (R. 838.) PA Presley noted: "Stress with brothers continuing to have substance use issues. Worried about his mom; they take advantage of her. She has large surgery soon." (R. 839.) Plaintiff also reported jaw pain. (R. 838.) PA Presley observed Plaintiff to have appropriate eye contact and speech, but also a depressed affect. (R. 841.) She "[r]eviewed exercises for clenching, leading to jaw pain," with Plaintiff. (R. 842.) He still was not engaging in behavioral interventions. (R. 838.)

Plaintiff visited PA Presley on March 2, 2022 to request a prescription refill. (R. 844.) PA Presley noted that Plaintiff was having "significant stressors in the home," resulting in taking more suboxone to cope with the stress. (R. 844.) PA Presley recounted: "Long discussion about how increasing dose of Suboxone is not going to help him cope. Rather, he needs to develop other tools to help with stress management. Again, emphasized the importance of a new environment and avoiding certain triggers." (R. 847.) She deemed Plaintiff's environment as "being unhealthy for ongoing recovery." (R. 844.)

On May 27, 2022, Plaintiff had an office visit with PA Presley for a prescription refill request. (R. 849.) Plaintiff reported that his mother had undergone surgery and that he had been taking care of her. (R. 850.) Plaintiff did not report concerns about anxiety or depression during this visit and was in no acute distress. (R. 852.) PA Presley recounted: "Long talk about his environment being a barrier to further personal growth.

Finds financial barriers are the reason he cannot leave his mother's home.  Interested in resources."  (R. 853.)

Plaintiff was seen by PA Presley on September 26, 2022 with anxiety identified as the reason for the visit.  (R. 855.)  His last reported opioid use was then over four years prior and last reported alcohol use was 3 years prior.  (R. 855.)  PA Presley noted the following:

> Anxiety is at new high level. Having 5-10 panic attacks a week. Does not like to take Seroquel, makes him tired but not removing anxiety. Depression baseline. Reports that his stressors include teenage daughters, relationship with their mother, financial strain, ongoing substance use with brothers. He is currently maintained on Lexapro, prazosin, Remeron as controller medications. Does have rescue hydroxyzine, does not find helpful. Seroquel, as mentioned not helpful for rescue, using for sleep. Does not have nonpharmaceutical methods for managing anxiety at this time. Ultimately interested in therapy, had a good relationship with prior therapist that has now left the clinic. He is nervous to restart, and does not like to retell his story. Prefers to work with PCP.

(R. 855.)  A PHQ-9 resulted in a score of 17, indicating moderately severe depression.

(R. 859.)  Plaintiff was started on Klonopin,[34] twice daily as needed for panic attacks, and PA Presley renewed his medical cannabis certification.  (R. 857, 859; *see* R. 26 (noting Klonopin was started in September 2022).)  Plaintiff had an appropriate appearance, eye contact, and speech, but his affect was "reserved" and "depressed," and he exhibited fidgeting body language.  (R. 858.)  Plaintiff reported applying for social security benefits and that finances were a large stressor.  (R. 856.)

---

[34]    Klonopin is a brand name for clonazepam, which is a medication that can be used to relieve panic attacks.  *See* Clonazepam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682279.html (last visited Mar. 20, 2025).

On October 26, 2022, Plaintiff had a follow-up visit with PA Presley by telehealth. (R. 862.)  PA Presley noted Plaintiff was having a "[t]ough month with life events."  (R. 862.)  He reported that his first cousin was recently diagnosed with colon cancer and he had a family history of Lynch syndrome,[35] including his cousin's mother.  (R. 862.)  However, she also noted the following: "Approved Trintellix.[36]  Yet to start.  Klonopin helpful.  Very good in life events- taking kids to practice, birthday party."  (R. 862.)  Plaintiff took a PHQ-9 that resulted in a 20, a severe level.  (R. 865.)  His current behavior interventions "include[d] none."  (R. 862.)  A mental health therapy evaluation was recommended for social security "per legal" and he had a court hearing scheduled for November 15, 2022.  (R. 862.)  He was alert and oriented times three.  (R. 864.)  Plaintiff was referred to therapy for his mental health issues and for genetic screening due to the family history of Lynch syndrome.  (R. 865-66.)

On November 3, 2022, Plaintiff was seen by Fardowsa Hassan, LADC.  (R. 869.)  Plaintiff was oriented but had a depressed, sad, and anxious affect and mood.  (R. 869.)  Plaintiff reported that he was experiencing severe depression, panic attacks with agoraphobia, and difficulty supporting his daughters while managing his mental health stressors, as well as sadness, lack of motivation, isolation from others, and binge eating.

---

[35]    Lynch syndrome is "an inherited disorder that increases the risk of many types of cancer, particularly cancers of the colon (large intestine) and rectum . . . ."  Lynch Syndrome, MedlinePlus, https://medlineplus.gov/genetics/condition/lynch-syndrome (last visited Mar. 20, 2025).

[36]    Trintellix is a brand name for vortioxetine, a medication that increases the amount of serotonin in the brain and is used for depression.  Vortioxetine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a614003.html (last visited Mar. 20, 2025).

(R. 870.)  Plaintiff stated that his depression had gotten worse over the years to the point where he believed it was unmanageable with medications.  (R. 870.)  He also noted that he had challenges seeking out therapy due to his agoraphobia and experiencing panic attacks when outside.  (R. 870.)  Plaintiff stated that his daughter lived with him and he was challenging himself to take her outside to the park, but also that his parents helped support his daughters.  (R. 870.)  Hassan believed Plaintiff had made minimal improvement.  (R. 870.)  The plan was for Plaintiff to engage in one therapy session a week.  (R. 870.)

On November 8, 2022, Plaintiff filled out a Claimant's Recent Medical Treatment form.  (R. 487-88.)  He stated he had seen Tegan Presley, PA; Dawn Brothers, PA; and Fardowsa Hassan, LADC, for medical treatment since August 13, 2020.  (R. 487.)  He reported the following diagnoses: severe episode of recurrent major depressive disorder; panic disorder with agoraphobia; opioid use disorder, in sustained remission; and alcohol use disorder, in early remission.  (R. 487.)  He also provided an updated list of medications, which included the following for anxiety and depression: Klonopin; Lexapro; Vistaril; Remeron; Minipress; Seroquel; and Vortioxetine (Trintellix).  (R. 489.)

Plaintiff saw Hassan again on November 11, 2022 to establish therapy services. (R. 874-98.)  Plaintiff endorsed the following depressive symptoms: sadness, hopelessness, guilt, loss of interest, worthlessness, restlessness, fatigue/no energy, sleeping too little, sleeping too much, poor self-esteem, irritable, unmotivated, insomnia, and sexual dysfunction.  (R. 875.)  As to anxiety, he reported the following symptoms: nervousness, hypervigilance, fearfulness, poor concentration, irritable, panic, headaches,

racing thoughts, avoidance, and difficulty focusing. (R. 875.) In addition, Plaintiff reported irritability and disorganized thinking, as well as the following trauma symptoms: flashbacks, disassociation, self-blame, irritable, sleep disturbance, nightmares, angry behavior, exaggerated startle response, detached, and poor memory of trauma. (R. 875.) As to Plaintiff's mental status exam, he was cooperative and wearing appropriate attire with normal attention and concentration, no impairment to recent or remote memory, and organized and reality-based thoughts, despite a sad, depressed, anxious, and labile mood and affect. (R. 875.) His eye contact was avoidant. (R. 875.) His anxiety was present and he was oriented to person, place, and time. (R. 875.)

When discussing his employment history, "[Plaintiff] endorsed experiencing challenging mental health stressors from panic attacks at work, social anxiety, severe depression and trauma related symptoms that have affected his ability to work." (R. 878.) Plaintiff scored a 20 on a PHQ-9 test and a 19 on his GAD-7, both severe levels. (R. 880.) Plaintiff took World Health Organization Disability Assessment Schedule ("WHODAS 2.0")[37] screening, answering that his difficulties were present in 25 of the last 30 days, with 7 of those days resulting in total incapacitation, and 15 other days that reduced his usual activities. (R. 881.) He was diagnosed with severe episode of recurrent major depressive disorder, without psychotic features; panic disorder with agoraphobia; opioid use disorder, severe, in sustained remission, on maintenance therapy, dependence; and alcohol use disorder, severe, in early remission (HCC-CMS). (R. 881.)

---

[37]    The WHODAS is a standardized test to measure health and disability. (R. 880.)

Hassan's November 11, 2022 clinical summary states:

> [Plaintiff] meets the criteria for Major Depressive Disorder, Post-Traumatic Stress Disorder, and Panic Disorder with Agoraphobia and Alcohol Use Disorder in early remission. [Plaintiff] reports challenges with managing his depression and feel emotionally dysregulated. [Plaintiff] reports experiencing severe panic attacks and agoraphobia where it's difficult for him to leave his home or lead a regular lifestyle. [Plaintiff] reports that he experiences social anxiety when taking his daughter to the park or being in social settings. [Plaintiff] reported that he faces daily challenges that have prevented him from being able to hold a job. [Plaintiff] reported that he experienced his first panic attack at work and that being in a work setting has been difficult ever since due to mental health stressors. [Plaintiff] endorsed being depressed all the time. [Plaintiff] displays significant psychological and physiological distress resulting from internal and external clues that are reminiscent of mental health related stressors.

(R. 881-82.)  Hassan recommended weekly therapy appointments.  (R. 882.)

**B.      Plaintiff's and Third-Party Reports**

On December 10, 2019, Plaintiff completed a Function Report – Adult.  (R. 387-96.)  He described his work limitations as:

> I suffer from Major Depressive Disorder, General Anxiety Disorder and Agoraphobia. Because of these conditions, particularly my General Anxiety Disorder and Agoraphobia, I fear leaving my home, particularly, leaving my home by myself. When I am forced to leave my house, I become very anxious and worry that something bad will happen to me. When I encounter people I do not know or if someone I do not know approaches me, I walk away from them because of my fear and anxiety of people I do not know. I also have frequent panic attacks approximately twice a month. When I have an anxiety attack I feel like I cannot breathe and my heart beats rapidly like I am having a heart attack. Because of my General Anxiety Disorder and Agoraphobia, it is impossible for me to function in a regular workplace and interact with co-workers and the public in a regular way.

(R. 389.)

Plaintiff described beginning his days by waking up and helping his daughter get ready for school until she was picked up by the bus at 7 a.m., before returning to bed until

10:30 or 11 a.m.  (R. 390.)  He reported that his mother would take care of his daughter when he was unable to get out of bed due to depression.  (R. 390.)  Otherwise, he would wait for his daughter to get home from school and spend time with her before going to bed at 10 p.m.  (R. 390.)  He was responsible for caring for his 6-year-old daughter, as well as a cat and two dogs, but received his parents' help when going through a depressive episode.  (R. 390.)

Plaintiff reported sleeping between 12 and 14 hours a day and that he stayed in bed all day during a depressive episode.  (R. 390.)  He reported that he also would not bathe or eat during these episodes and had to be reminded by his parents to do so.  (R. 390-91.)  He prepared basic meals like frozen pizza, chicken in the oven, or spaghetti on the stove three days a week for about 30 minutes a day.  (R. 391.)  He did laundry and washed dishes two days a week and also shoveled snow, but required his mother to remind him to do so and help him complete the tasks.  (R. 391.)

Plaintiff stated he left his home once a day by walking or by car but only went to known places near his home.  (R. 392.)  He stated that if he left home unaccompanied, he would have severe anxiety or a panic attack.  (R. 392.)  He would visit the corner store one block from his home twice a month to get groceries, only taking 20-30 minutes.  (R. 392.)  His parents had always managed his finances due to his anxiety and depression.  (R. 392-93.)  His interests and hobbies included watching television, playing card games, or playing board games with his daughter.  (R. 393.)  He stated he used to be active playing various sports but now lacked any interest in them.  (R. 393.)

Plaintiff reported spending time with his parents and daughter and that he did not socialize with anyone else. (R. 393.) The only places he visited on a regular basis were the corner store twice a month and the health clinic for therapy once a week. (R. 393.) He reported generally isolating himself from others and that he did not communicate with other people. (R. 394.) He checked boxes on his function report indicating that his anxiety and depression were affecting his memory, ability to complete tasks, concentration, understanding, and ability to get along with others. (R. 394.) Specifically, he stated: "I have difficulty with my mental functioning. It is difficult to focus and I have issues with concentrating, understanding, and completing a task after starting it. I also am fearful of others and have issues in social settings getting along with others." (R. 394.) Plaintiff said he did not finish what he starts and was only able to pay attention for 20 minutes at a time. (R. 394.) He could follow written directions "fairly well," but claimed he "may get sidetracked" if too many steps were involved. (R. 394.) He reported having trouble remembering verbal instructions and needing to have them repeated or to write them down. (R. 394.)

Plaintiff also stated that he handled stress poorly, specifically he "may respond with severe anxiety attack requiring ER visit." (R. 395.) He reported having fears of leaving the house, strangers, and of being attacked. (R. 395.) He reported taking the following medications: Suboxone; Cymbalta; Remeron; Minipress; and Vistaril. (R. 395.)

In conclusion, Plaintiff provided the following remarks:

I suffer from major depressive disorder, general anxiety disorder and agoraphobia. Because of these conditions, I have significant limitations on my day to day [sic] functioning. Because of my major depressive disorder, I will have episodes of major depression where I will not be able to get out of bed and will sleep nearly 24 hours for days at a time. During these episodes of depression, I will not bathe and have to be reminder/encouraged to eat by my parents. During a depressive episode I am also unable to care for my daughter or complete any responsibilities for her or myself. My general anxiety disorder and agoraphobia also significantly limit my level of functioning. I am fearful of leaving my home, particularly if I have to leave my home by myself. When I am outside and hear loud noises, I become anxious and fear that someone will sneak up and attack me. I also fear crows and being around others for long period of time. Because of my disability conditions of major depression, general anxiety disorder and agoraphobia, I am not able to function in a regular workplace, comply with a regular work schedule or interact with others in a normal way.

(R. 396.)

Plaintiff's mother completed a Function Report – Adult – Third Party on December 18, 2019. (R. 408-415.) Plaintiff's mother described his condition as: "Suffering from social anxiety – Sleeps alot when daughter is gone feels a sense of failure and lack of purpose doesnt leave room – overall feeling sick." (R. 408 (errors in original).) His mother stated that Plaintiff did not do much when his daughter was not home and would stay in his room; if his daughter was home, he cared for her by cooking, giving baths, and playing games. (R. 409.) She stated that Plaintiff cared for his daughter, sometimes fed and watered the pets, and cared for her mother. (R. 409.) Plaintiff's mother stated that Plaintiff could no longer engage in social activities like family get-togethers. (R. 409.) Addressing Plaintiff's sleep, she wrote: "He feels safer during the day so he's awake off and on during the night and sleeps during the day." (R.

409.)  She also noted that during his "episodes" Plaintiff's personal care suffered and he did not bathe, shower, or take care of himself in any way.  (R. 409.)  Specifically, she noted: "[s]ometimes it seems chalenging for him to do any thing."  (R. 410 (errors in original).)  She also had to remind him to take his medication.  (R. 410.)

Describing his capacity for preparing meals, Plaintiff's mother says that, while it depended on how he was feeling that day, he prepared food most of the time, taking about 20 minutes to do so.  (R. 410.)  However, sometimes he did not feel like cooking or eating.  (R. 410.)  She said it was hard for Plaintiff to find the motivation to do house or yard work.  (R. 410.)  Sometimes he would do chores for about an hour or so but other times not at all.  (R. 410.)  She also had to provide help or encouragement to make sure he finishes what he was trying to do.  (R. 410.)  Plaintiff would go outside infrequently, and mostly in the yard with his daughter or to the park.  (R. 411.)  She noted that he would shop for food for his daughter about two or three times a month, each time lasting about 15 minutes or so.  (R. 411.)  Plaintiff's mother stated she has always taken care of his financials for him.  (R. 411.)  She said that Plaintiff spent time playing video games, playing board games, and watching television, and was no longer interested in sports.  (R. 412.)  In describing Plaintiff's social activities, Plaintiff's mother said that he only spent time with his family, but would also take his daughter to school, doctors' appointments, or the store.  (R. 412.)  She would often have to remind him to go places.  (R. 412.)  She said he did not hang out with friends.  (R. 412.)

Plaintiff's mother indicated that Plaintiff's condition impacted his memory, his ability to complete tasks, his concentration, his ability to understand, and his ability to get

along with others.  (R. 413.)  She wrote: "He gets overwhelmed and scrambled easily which makes him retreat."  (R. 413.)  She described the duration for which he could pay attention as "[s]hort times," his ability to follow written instructions as "fair," and his ability to follow spoken instructions as "[s]crambled."  (R. 413.)  And while he respected authority figures, she stated that Plaintiff has anxiety and panic around others, even family members.  (R. 414.)  She also wrote that he was not able to handle stress or changes in routine well because it triggered his anxiety and panic.  (R. 414.)  Generally, she reported that he experienced fear and anxiety when he is in public.  (R. 414.)

Finally, Plaintiff's mother concluded:

> Manuel has been in and out of the hospital with panic attacks Manuel has had a very stressful child hood ontop of his c[h]emical imbalances His father + my self are alcoholics with several c[h]emical imbalances He has always been mostly a home body when he feels safe The accidental shooting and threats of being put in jail over child suport as well as his daughters heart surjery has made his issues ten times worse[.]

(R. 415 (errors in original).)

## C.    Opinion Evidence

In making his determination, the ALJ addressed opinions from consultative examiner Dustin Warner, PsyD (dated March 31, 2015); Alford Karayusuf, MD (dated January 23, 2020); Larry Kravitz, PsyD (dated February 13, 2020 and made as part of the initial determination); and Cynthia Crandall, PhD, LP (dated June 10, 2020 and made as part of the reconsideration determination).  The Court summarizes those opinions below.

1.    **Dr. Warner**

On March 31, 2015, Dr. Warner conducted a consultative examination of Plaintiff in connection with an earlier application for SSI benefits, which was denied. (R. 521-25; *see* R. 195-209 (referencing 2015 application.)  Dr. Warner described Plaintiff's medical history to that point as:

> The claimant reported, "Panic and anxiety." He explained having such problems for several years, and they became progressively worse around age 16 or 17. Although he denied any hospitalizations for medical or psychiatric reasons, his panic symptoms have led him to emergency departments of local hospitals. He described having shortness of breath, choking sensations, chest pounding, dizziness, pacing, and shakiness. The claimant revealed working with Beth Spooner, psychiatrist, who prescribed Prozac, Toprol[38], trazodone and Ativan[39] (p.r.n.) . [sic] He met with a therapist, Paula Coyne, for one visit.

(R. 521.)  At that time, Plaintiff denied any drug or alcohol use, but told Dr. Warner that he had been taking two shots of vodka on a frequent basis as recently as 93 days prior. (R. 522.)  Dr. Warner also highlighted medical records from January 4 to 9, 2015, where Plaintiff was admitted to a hospital due to alcohol; alcoholic hepatitis; depression, anxiety, and panic disorder; and a cut to his left ear.  (R. 522.)

As to Plaintiff's daily functioning, he told Dr. Warner that he showered two or three times a week, cooked for himself, washed the dishes, cleaned up around the house,

---

[38]    Toprol is a brand name for metoprolol, a medication used to treat high blood pressure.  *See* Metoprolol, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682864.html (last visited Mar. 20, 2025).

[39]    Ativan is a brand name for lorazepam, a medication used to relieve anxiety.  *See* Lorazepam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682053.html (last visited Mar. 20, 2025.)

make his bed, did his laundry, and brushed his teeth "excessively," according to his

girlfriend, who attended the appointment with him. (R. 522.) He did not engage in

grocery shopping. (R. 522.) Plaintiff reported having limited contact with other people,

restricted to only family. (R. 522.)

Dr. Warner described Plaintiff's mental status as follows:

The claimant was alert and oriented to person, place, and time. Her [sic] grooming and hygiene were disheveled. He gave adequate eye contact. Speech was clear and goal directed. He was cooperative with the examination process. He ambulated at a normal pace, but was bouncing his legs. He was known to pace from time-to-time. Thought processes were intact. Thought content was unremarkable for hallucinations or delusions. Stream of consciousness was clear and reality based.

Affect was restricted in range. He was anxious with a history marked by shortness of breath, choking sensations, chest pounding, dizziness, pacing, and shakiness. Mood was depressed. He complained of sleep disruption, and his appetite consisted of two meals per day. Energy level was low. There was no suicidal or homicidal, or preoccupation voiced. He recalled six digits forward and four digits backwards. He recalled two of three after 5 minutes and one of three objects after a 30 minute delay. He could do serial 7's, 3's and count backwards from 20 at a normal pace. Abstraction of proverbs yielded good interpretations. Insight was good, but judgment was fair. Recent and remote memories were intact. Estimated level of intelligence was average. He did not present with personality disorder or pain disorder.

(R. 522-23.)

Dr. Warner stated that Plaintiff's prognosis was guarded. (R. 523.) His diagnostic

impression of Plaintiff was panic disorder. (R. 523.) Dr. Warner concluded:

The claimant has the mental capacities to understand, remember, and follow simple instructions. He can sustain his attention and concentration skills for routine or repetitive work with reasonable pace and persistence. He would respond best to brief or superficial contact with coworkers, or supervisors.

He would tolerate minimal stress and pressure found in an entry-level workplace.

(R. 523.)

## 2. Dr. Karayusuf

On January 23, 2020, consultative examiner Dr. Karayusuf examined Plaintiff. (R. 608-11.)  He described Plaintiff as casually dressed and groomed.  (R. 608.) Plaintiff's chief complaint to Dr. Karayusuf was "I have bad panic attacks.  I have this in a group of people.  I can't be in a group of people.  I get nervous.  I can't even take my daughter to the park if there are three or four families in the park.  I don't leave home without my mother."  (R. 608.)  Dr. Karayusuf then noted that Plaintiff "arrived today without his mother."  (R. 608.)

Dr. Karayusuf's report stated that he had reviewed Plaintiff's medical records including those from visits on October 29, 2019; October 24, 2019; September 26, 2019; August 12, 2019; June 26, 2019; April 10, 2019; and Dr. Warner's March 31, 2015 report.  (R. 608.)  He noted Plaintiff's diagnoses of, among other things, panic disorder with agoraphobia, major depressive disorder, opioid use disorder, PTSD, and alcohol withdrawal syndrome.  (R. 608.)

Dr. Karayusuf reported that Plaintiff was 16 years old when he had his first panic attack and had a history of one psychiatric hospitalization for an episode of major depression in 2014, but had never attempted to commit suicide.  (R. 608.)  Plaintiff stated he was taking Cymbalta, Remeron, Wellbutrin, Hydroxyzine, Prazosin and Seroquel under the supervision of CNS Spooner-Falde at the time, but was seeing little to no

improvement on this regimen.  (R. 608.)  Dr. Karayusuf identified two sources of trauma, a robbery in his apartment when he was 18, and a car accident while driving in 2015, both of which caused Plaintiff nightmares and flashbacks.  (R. 609.)  Plaintiff was sleeping 8-10 hours a night when taking psychotropic medications and slept through the night in order to see his daughter off to school in the morning.  (R. 609.)  Since taking Remeron and Seroquel, Plaintiff reported seeing an increase in his appetite.  (R. 609.)  Dr. Karayusuf reported: "[Plaintiff] is anxious."  (R. 609.)  Plaintiff told Dr. Karayusuf that he worries "about the dumbest things.  I'm scared most of the time.  I worry that something will happen to my daughter at school.  I worry about my mother's health."  (R. 609.)  Plaintiff also reported diminished concentration and memory.  (R. 609.)  Plaintiff also told Dr. Karayusuf that he tried to work for his uncle's moving business for a couple of weeks in 2016 but he could not handle the stress.  (R. 609.)

Plaintiff also noted his history of alcohol use, but did not acknowledge any history of drug abuse, despite the medical record suggesting otherwise.  (R. 609.)  He reported that he had completed inpatient substance abuse treatment and achieved sobriety seven months prior.  (R. 609.)

Plaintiff described his daily functioning.  Plaintiff stated he brought his daughter to school every morning; bathed once or twice a week; rarely made his bed; cooked for himself; went grocery shopping every two weeks if the store was not crowded; dusted and vacuumed every day; did laundry every two weeks; and washed dishes twice a week.  (R. 609.)  Plaintiff did not go to church or movie theaters and did not read, have hobbies, or have any friends.  (R. 609.)  He reported playing cards and board games with his

48

daughter occasionally and watching television 2-3 hours a day, including the news. (R. 609.) He could concentrate on interesting programs. (R. 609.)

> Dr. Karayusuf provided the following description of Plaintiff's mental status:
>
> He was oriented to time, place and person. Immediate digit recall was not good. He recalled six digits forwards and two digits backwards. He recalled the names of four out of the last five presidents of the United States accurately and in correct order. He was not able to subtract serial-7's. He did subtract 15 - 6 accurately. He recalled two out of three unrelated objects after five minutes. Recent and remote memory are intact. He reports no hallucinations, no delusions. He doesn't trust anyone. He reports no ideas of reference.
>
> He entered the consultation room and sat in his chair with good posture. He related in an anxious, somewhat subdued, polite manner. He was spontaneous and provided information without being asked. He was cooperative and answered all questions asked. He was not restless. He showed no psychomotor agitation and no psychomotor retardation. He showed no vigilance in scanning. Tension was moderate. Eye contact was good. Speech was coherent, relevant with no neologisms, no pressure and no flight of ideas. Facies were a bit subdued. He was not tearful. Mood was mildly-to-moderately depressed. Affect was appropriate. He had no loosening of associations.

(R. 609.)

Dr. Karayusuf diagnosed Plaintiff with alcohol dependence in apparent remission; PTSD; major depression, recurrent, mild-to-moderate, in partial remission; generalized anxiety disorder, moderate; and panic disorder with agoraphobia. (R. 610.) He noted there was a question of an opioid use disorder, along with suboxone use, which needed to be verified. (R. 610.) Dr. Karayusuf's prognosis was "Guarded." (R. 610.)

Dr. Karayusuf concluded as to Plaintiff's limitations:

> He is able to understand, retain and follow simple instructions. He is restricted to work that involves brief, superficial, infrequent interactions with fellow workers, supervisors and the public. Within these parameters and in

the context of performing simple, routine, repetitive, concrete, tangible tasks,
he is able to maintain pace and persistence. He is able to manage benefits.

(R. 610.)

### 3.    Dr. Kravitz

Dr. Kravitz conducted the Psychiatric Review Technique ("PRT") for Plaintiff in

connection with the initial determination of benefits on February 13, 2020.  (R. 199-206.)

Dr. Kravitz concluded that Plaintiff did not satisfy the criteria for the following Listings:

12.04 Depressive, Bipolar and Related Disorders; 12.06 Anxiety and Obsessive-

Compulsive Disorders; or 12.15 Trauma and Stressor-Related Disorders.  (R. 199-200.)

In considering the Paragraph B criteria, Dr. Kravitz assessed Plaintiff with mild

limitations to his ability to understand, remember, or apply information; moderate

limitations in his ability to interact with others; moderate limitations in his ability to

concentrate, persist, or maintain pace; and moderate limitations in his ability to adapt or

manage oneself.  (R. 200.)  With respect to Paragraph C criteria, Dr. Kravitz concluded

that the evidence did not establish the presence of those criteria.  (R. 200.)

As to the RFC, Dr. Kravitz found Plaintiff was not significantly limited in his

ability to carry out very short and simple instructions, carry out detailed instructions,

sustain an ordinary routine without special supervision, work in coordination with or in

proximity to others without being distracted by them, and make simple work-related

decisions.  (R. 203-04.)  He found Plaintiff was moderately limited in his ability to:

maintain attention and concentration for extended periods; perform activities within a

schedule, maintain regular attendance, and be punctual within customary tolerances;

complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 204.)  He concluded that Plaintiff was moderately limited in his ability to interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation.  (R. 204-05.)  Dr. Kravitz found Plaintiff was not significantly limited in his ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, and set realistic goals and make plans independently of others.  (R. 204-05.)  Dr. Kravitz concluded:

> Claimant retains the ability to perform simple, routine tasks mentally, but would require a static work environment requiring no more than incidental public contact, only brief and superficial coworker and supervisor contact, with few changes in the day-to-day work routine, and only routine, predictable work stressors.

(R. 205.)

### 4.    Dr. Crandall

Dr. Crandall assessed Plaintiff in connection with the reconsideration determination on June 10, 2020.  (R. 212-222.)  Dr. Crandall's conclusions as to the Listings and RFC were the same as Dr. Kravitz's.  (*See* R. 213-19.)

Dr. Crandall concluded:

After careful consideration of all evidence in file, the prior administrative finding remains persuasive as it is consistent with and supported by the totality of evidence in file. [Claimant] has a severe medically determinable mental impairment that does not meet or equal any listing and causes only mild to moderate impairment in functioning. [Claimant] is [diagnosed] with a substance use disorders [sic], depression, social anxiety and features of PTSD. [Claimant's] allegations of worsening [symptoms] are somewhat supported; however, [the medical evidence of record] suggests that some of his [symptoms] are better, while others increased in the context of substance use. [The medical evidence of record] also indicates that [Claimant] is only intermittently adherent with his suboxone and may not be taking his prazosin as prescribed. The CE is only partially persuasive. Although [Dr. Karayusuf] noted instances of inconsistency (I don't leave home without my mother-he arrived without his mother; he does not acknowledge any [history] of drug abuse although the record suggests otherwise), [Dr. Karayusuf] seemed to take [Claimant's] report of [symptoms] at face value. He also did not note [Claimant's] ability to handle stress.

(R. 216.)

## D.    Plaintiff's Testimony Before the ALJ

Plaintiff testified at both hearings before the ALJ. (R. 147-158, R. 173-188.) At both hearings, he testified regarding several traumatic experiences, including a robbery at his apartment about 10 years before, watching his father beat up his mother, a car accident in 2015, losing his best friend to an overdose, and shooting one of his friends in the stomach. (R. 149-50, 154 (2021 hearing); R. 174-75 (2022 hearing).) Plaintiff testified that he suffers from flashbacks and nightmares relating to the robbery and car accident. (R. 154-55 (2021 hearing), R. 175-76 (2022 hearing).)

During the second hearing before ALJ Chin, Plaintiff testified about the impact of those events.[40]  He testified: "It's really hard to do pretty much anything.  I get very worried when I'm outside, or if I need to make an appointment, or take my kids out, anything."  (R. 176.)  He also testified that he no longer plays sports, goes to the gym or drives places, choosing to stick around the area of St. Paul where he lives.  (R. 176.)

Plaintiff also testified that he had been diagnosed with PTSD, depression, anxiety, and agoraphobia, where his depression and anxiety diagnoses began when he was 14 or 15 years old and his PTSD diagnosis began in 2010.  (R. 176-77.)  Asked about his symptoms related to depression, Plaintiff listed: "Sad, worthless, fatigued, very irritable, staying up all night," which he experiences "nearly every day."  (R. 177.)  He testified that he has depressive episodes that cause him either to sleep too much such that he cannot get out of bed or he will not sleep at all and end up staying up "for a couple days." (R. 177.)  These episodes cause him to get help from his parents to care for his daughter because he is "really not able to function much for sometimes up to three or four days." (R. 177.)  Plaintiff testified that he has depressive episodes at least once or twice a month. (R. 177.)  They are triggered by "[j]ust mostly everyday life stuff, appointments coming up, my daughter's schedules," and "[p]retty much, anything can trigger it, actually, from a nightmare."  (R. 178.)

---

[40]    Plaintiff also testified at about these events and his mental health during the first hearing before ALJ Washington, but his testimony during that hearing was essentially consistent with his testimony during the second hearing, so the Court focuses on the testimony before ALJ Chin, as he issued the decision appealed by Plaintiff in this action.

Turning to his anxiety and agoraphobia, Plaintiff testified that he first started experiencing anxiety at age 15. (R. 178.) He stated his symptoms as "I get very scared, nervous. So much stuff running through my head. I try to stay away from everybody," resulting in a state where "I can't focus at all." (R. 178.) Plaintiff testified that his anxiety is exacerbated by "[p]retty much everything, as bad starts of the day" and he "just sometimes wake up with really bad anxiety if I have [a] doctor's appointment, or if I after leave somewhere in a car." (R. 178.) Describing how he feels when he leaves his house, he stated: "Very scared. I'm scared. I feel irritable, paranoid, just my heart is just racing like crazy. I get really shaky." (R. 178.) When asked to describe how it feels to be around people he does not know or a crowd of people, Plaintiff testified that he tries his best to get out of that crowd as soon as possible and will usually start going into a panic attack pretty quickly. (R. 179.) He conveyed that if he does go out, he will plan his day "around to where there is always an emergency exit or something that I can get to, to make sure I can get out of a crowd." (R. 179.) When asked about his ability to interact with other people, Plaintiff testified that he tries to stay far away from most people, and that despite attempting to interact with people for his daughter's sake, he gets too nervous to really talk. (R. 179.)

Plaintiff also testified that he has panic attacks, which he described as: "I just start seizing up. I start having hot and cold sweats, shaking, disorganized, racing thoughts, room closing in on me. A lot of things." (R. 179.) He testified that he has at least two panic attacks a week but usually between two to three a week. (R. 179.) According to Plaintiff there is not anything specific that triggers a panic attack—"I can be having

54

regular days and they just start"—but he will "probably have a panic attack if I know I have to go up to []Minneapolis for a doctor's appointment or something." (R. 179-180.) Plaintiff testified that he had experienced a panic attack in public, and he went to the bathroom and stayed in a stall with the lights on. (R. 180.) Plaintiff testified that it helped to get back to his room, where he mostly felt safe, and he would try to take some of his medication in the hopes it will subdue his symptoms. (R. 180.) Plaintiff testified that he went to the emergency room when he first started experiencing panic attacks because he was so young he did not know what was going on, and thought he was having a heart attack. (R. 180-81.)

Plaintiff testified that his anxiety and panic attacks have gotten worse since the Covid-19 pandemic and were "[v]ery bad." (R. 181.) Specifically, the pandemic made his anxiety worse because he was feeling "so backed into my house." (R. 181.) He struggled with teaching his daughter an entire grade of school, because he had a very hard time learning and teaching himself. (R. 181.)

Plaintiff testified that his anxiety and depression made it difficult to concentrate. (R. 181.) He reported that it was "pretty hard to sit down and try watching something or write something down." (R. 181.) Plaintiff testified that concentrating for him was hard because he is "more or less" having anxiety or anxiety attacks at the same time. (R. 182.) Plaintiff testified that he was taking Lexapro, Klonopin, Seroquel, hydroxyzine, Prazosin, and Trintellix for his anxiety and depression, had started taking medication for his depression and anxiety when he was about 17 years old, and took it consistently besides a "couple of years throughout my 20s when [he] didn't take any." (R. 182.) He testified

that he had been taking his medication since he filed his application for social security benefits in 2019.  (R. 182.)

Plaintiff testified regarding his mental health therapy.  (R. 181-82.)  At the time of the hearing before ALJ Chin, he had been seeing Hassan "for a couple weeks," but had previously seen Butler for about two years, between 2019 and 2021, before Butler left UFM.  (R. 183.)  Plaintiff testified that he did not seek a therapist for a while after Butler left UFM because "I've had a long host of problems of usually every worker I get, or a doctor, whenever I'm with them for a few years, they always end up leaving me, and it takes so long for me to feel comfortable and to tell them things that I don't even tell my parents.  And just to have to restart all that with a new person."  (R. 184.)  He also testified: "I don't think they had any guys available at that time.  It was just women, which is not a bad thing, but I just prefer a male."  (R. 184.)

Plaintiff testified that he continued his mental health treatment with PA Presley, his primary care provider, after Butler left UFM.  (R. 184.)  PA Presley provided prescriptions for his depression, anxiety, and panic attack medication, and also made his "appointments a bit longer so that we could talk about what's been going on with me lately."  (R. 184-85.)  Plaintiff stated that he stayed with PA Presley because he had "been seeing her for a few [sic]" and she "been there with [him] from the start of this process."  (R. 185.)  He was really comfortable with PA Presley, but she was leaving UFM the next week.  (R. 185.)  Plaintiff could see a future with his current therapist, Hassan, who was "nice."  (R. 185.)

As to employment, Plaintiff testified that his last job was at a carwash in 2006 or 2007. (R. 185.) He worked there about 10-15 hours a week for about a year and a half. (R. 185.) He did not really need to interact with other people at that job because he was vacuuming and wiping down cars. (R. 185-86.) His friend usually interacted with other people for him at the car wash, and the other people working there were friends from school, who let him do tasks where he was "mostly just on [his] own during the day" and did not have to talk to customers. (R. 186.) He recalled that he stopped working at the car wash because he had his first panic attack there and when he tried to go back the business had closed. (R. 186-87.) Since then, he worked for his uncle moving houses for a week and a half before leaving because the locations were far away, he had to interact and be around customers, and the hours were very long. (R. 187.) He was also having panic attacks on the job which caused his uncle to do all the work. (R. 187-88.)

Plaintiff concluded his testimony with the following statement:

I would like to let you know how debilitating and my mental health is. I go through long periods of hopelessness, worthlessness, and just feel like a burden to the people around me. It is so difficult to get normal tasks done, or just getting up for the day. Every day I have to deal with something from my mental health, flashbacks, panic attacks, anxiety attacks. I feel like I'm fighting against myself daily. I would do anything to have a normal life with going to work and having friends, and all the norms of most people's lives. But my body doesn't let me work that way. And as the years go on, it just keeps getting tougher and tougher.

(R. 188.)

## E.    The VE's Testimony Before the ALJ

VE Thomas testified at the second hearing before ALJ Chin. (R. 188-91.) She testified that a hypothetical individual with Plaintiff's age, education, and past work

history, who was "limited to simple and repetitive tasks in a routine work setting performed in a work environment with no assembly line work or work that requires only quotas involving only simple-work related decisions and infrequent and gradual workplace changes," where the individual was "limited to no interaction with the public, with occasional interaction with coworkers and supervisors," would not be able to perform Plaintiff's past role as a car wash attendant as it was actually or generally performed. (R. 189-90.) However, the VE identified three positions for such an individual: the dishwasher; equipment washer; or warehouse worker roles relied on by the ALJ in his decision. (R. 190.) The VE also testified that additional limitations of needing to be allowed time off task for 20 percent of the day in addition to regularly scheduled breaks as well as needing to be absent from work two days a month would preclude such an individual from holding any of the jobs she identified. (R. 190-91.)

## F.   Medical Expert's Testimony Before ALJ Washington

Plaintiff argues in his brief that "the January 27, 2021 ALJ Hearing testimony of the Medical Expert, Dr. Kevin Schumacher also supports a finding [Plaintiff] meets the criteria at Section C." (Dkt. 7 at 23.) The Court therefore reproduces the relevant testimony below.

> Q So, Doctor, I wanted to follow up and ask what your opinion is about whether or not [Plaintiff] met the criteria at paragraph C, whether or not his major depressive disorder or generalized anxiety disorder was, and panic attacks with agoraphobia would meet the definition of being a serious and persistent mental disorder?
>
> A Yeah, I think he probably meets that in number one for the C criteria. I don't think that he meets item number two.

58

Q Okay. And why is that, particularly in the case of the panic disorder with the frequent panic attacks?

A Yes. The main reason is it looks like he is able to deal with immediate family and some quarantining issues. I'm a little unclear on why he can't drive. Well, I don't know. The record doesn't help me understand why he can't drive. I don't think he has minimal capacity to adapt to changes in the environment, and that's the part of item number two of the C criteria.

Q Okay. And what specific things in the medical record or the other medical opinions from acceptable medical sources make you believe that he has the capacity, other than a minimal capacity, to adapt to changes in his environment?

A Well, I don't see why he wouldn't. The panic disorder is physical for that. There's no doubt about it. He's receiving some treatment for that. It would be ill advised for him to, for example, just isolate himself and stay at home because the panic disorder would likely get worse. So I don't see anybody saying that. . . .

(R. 163-64.)

## III.    LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018).  As defined by the Supreme Court:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence . . . is more than a mere scintilla.  It means— and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

59

*Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (cleaned up).

"This court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (citation omitted and cleaned up). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)). The record is viewed in the light most favorable to the agency's determination. *Chismarich*, 888 F.3d at 980.

## IV.    DISCUSSION

Plaintiff makes two arguments in support of remand. First, Plaintiff argues that the ALJ erred at step three in finding that Plaintiff does not have an impairment or impairments that meets the severity of the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 because the ALJ improperly disregarded details that supported such a finding. (Dkt. 7 at 10-24.) Second, Plaintiff asserts that the ALJ erred at step five in "not finding" that Plaintiff lacked the RFC to perform any work in the national economy. (*Id.* at 24-26.)

**A.   Threshold Issues**

Before turning to Plaintiff's challenges to the ALJ's conclusions at steps three and

five, the Court addresses two threshold issues: the weight assigned to Plaintiff's

subjective complaints and Plaintiff's "non-stressful settings" and "stressful situations"

argument.

**1.   Weight Assigned to Plaintiff's Subjective Complaints**

Both of Plaintiff's challenges rely on the premise that the ALJ improperly

discounted his subjective complaints.  (*See* Dkt. 7 at 25 (arguing in connection with RFC

challenge that "the ALJ erroneously concluded that the medical evidence and other

evidence in the record did not support Mr. [F. Z.'s] statements regarding the intensity,

persistence and limiting effects of these symptoms"); *see also id.* at 14-16 (relying on

Plaintiff's reports of anxiety, panic attacks, and depression to medical providers; GAD

results; and Adult Function Reports when challenging ALJ's finding as to the Listings).

The Court therefore addresses the weight assigned to Plaintiff's subjective complaints

before turning to the ALJ's findings at step three and step five.

When determining a claimant's RFC, an ALJ takes into account the claimant's

symptoms and evaluates the intensity, persistence, and limiting effects of those

symptoms.  Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p,

2016 WL 1119029, at *2 (Soc. Sec. Mar. 16, 2016); *see, e.g.*, *Bryant v. Colvin*, 861 F.3d

779, 782 (8th Cir. 2017) ("Part of the RFC determination includes an assessment of the

claimant's credibility regarding subjective complaints.").[41]  In determining the intensity,

persistence, and limiting effects of those symptoms, the ALJ

> examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  This evaluation includes consideration of the

following factors: "(i) the claimant's daily activities; (ii) the duration, frequency, and

intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the

dosage, effectiveness, and side effects of medication; and (v) the claimant's functional

restrictions."  *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) (citing *Polaski v.*

*Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)); *see* 20 C.F.R. § 416.929(c)(3); SSR 16-

3p, 2016 WL 1119029, at *7.  The ALJ also considers whether there are inconsistencies

between the claimant's statements and the rest of the medical evidence, only accepting

---

[41]    As background:

> SSR 16-3p eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, as the regulations do not use this term. In doing so, the SSA clarifies that subjective symptom evaluation is not an examination of an individual's character. Instead, the SSA will more closely follow [the] regulatory language regarding symptom evaluation."

*Krick v. Berryhill*, No. 16-CV-3782 (KMM), 2018 WL 1392400, at *7 n.14 (D. Minn. Mar. 19, 2018) (cleaned up); *see* SSR 16-3p, 2016 WL 1119029, at *1; *see also* Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304, at *1 (Soc. Sec. Oct. 25, 2017) (republishing SSR 16-3p and clarifying SSR 16-3p applies to "determinations and decisions on or after March 28, 2016").

those statements that can "reasonably be accepted as consistent" with the rest of the record in making its RFC determination.  20 C.F.R. § 416.929(c)(4).

"[C]aselaw is clear the ALJ is not required to discuss each factor."  *Michlitsch v. Berryhill*, No. 17-CV-3470 (MJD/TNL), 2018 WL 3150267, at *15 (D. Minn. June 12, 2018) (citing *Bryant*, 861 F.3d at 782; *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010); *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)), *R. & R. adopted*, 2018 WL 3150225 (D. Minn. June 27, 2018).  Instead, the ALJ must only "minimally articulate his reasons for crediting or rejecting evidence of disability."  *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)).  "Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision."  *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quotation omitted); *see Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.") (quotation omitted); *see also Lawrence v. Saul*, 970 F.3d 989, 995 (8th Cir. 2020) ("In *Polaski* and cases that followed, we examined subjective complaints with reference to a claimant's credibility.  Social Security Ruling 16-3p eliminates use of the term 'credibility' and clarifies that the Commissioner's review of subjective assertions of the severity of symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between subjective assertions and the balance of the record as a whole.  SSR

16-3p applies to Lawrence's case, but it largely changes terminology rather than the substantive analysis to be applied.").

Here, the ALJ summarized Plaintiff's subjective complaints and concluded that they were not consistent with the objective medical evidence. (R. 120-21.) The ALJ acknowledged that "treatment notes noted some signs consistent with mental dysfunction, such as a depressed and anxious mood, a flat and depressed affect, and fidgeting body language," but also that "overall, mental status examinations during the relevant period reflect mostly unremarkable findings." (R. 120.) These findings included that Plaintiff was "alert, oriented, casually dressed, groomed, and pleasant"; his mood and affect were appropriate; he had "appropriate comprehension and expression, no indication of psychosis, organized and goal-directed thought processes, reality based thought content, intact associations"; and he had "intact memory, average intelligence, normal concentration and attention, normal abstraction, appropriate and cooperative behavior, an intact fund of knowledge, good insight and judgment, and spontaneous, logical, and coherent speech." (R. 120.) The ALJ also relied on consultative examiner Dr. Karayusuf's report, which included similar objective observations, while also noting some issues with immediate digit recall and subtracting serial 7s, as well as some anxiety and depressed mood. (R. 120.) The ALJ did not err in discounting Plaintiff's subjective reports based on "normal or relatively normal mental status except for tearfulness, anxiety, and sad mood." *See Melanee B. v. Kijakazi*, No. 20-CV-1179 (ECW), 2021 WL 4199333, at *20-21 (D. Minn. Sept. 15, 2021) (affirming finding that plaintiff's PTSD, anxiety, and depression were nonsevere despite "her reports of anxiety and depression;

observations of a sad, depressed, tearful, and anxious affect at times; and her PTSD diagnoses" based on otherwise her "normal or relatively normal mental status" exams). Further, Plaintiff's reliance on GAD scores is unpersuasive, as GAD and PHQ scores are calculated from a patient's own subjective experience and are designed to quantify their subjective symptoms. *See Joseph R. L. v. Kijakazi*, No. 20-CV-2586 (JFD), 2022 WL 1720930, at *7 (D. Minn. May 27, 2022) ("GAD-7 forms are completed independently by the patient and are intended to reflect subjective symptoms.") (citing *Amy R. v. Saul*, No. 19-CV-1508 (KMM), 2020 WL 3077502, at *1 (D. Minn. June 10, 2020) ("[T]he PHQ-9 and the GAD-7 are measurements that are derived solely from the patient's report of their own subjective experience."); *Sheila A. v. Berryhill*, No. 17-CV-2161 (HB), 2018 WL 4572982, at *4 (D. Minn. Sept. 24, 2018) ("Because the content on a PHQ is derived exclusively from the patient's subjective complaints, it is subject to being credited or discredited for the same reasons as other subjective complaints."), *aff'd*, 802 F. App'x 228 (8th Cir. 2020)).

Plaintiff also argues: "The ALJ also erroneously characterizes Mr. [F. Z.'s] medical treatment, consisting of a regiment of prescription medication, including Suboxone, Klonapin, Lexapro, Seroquel, and Vistaril and outpatient therapy as 'conservative' treatment." (Dkt. 7 at 26.) According to Plaintiff, he "experienced limited improvement despite years of consistent treatment with medication and psychotherapy." (*Id.* at 25-26.)

An ALJ can consider a claimant's conservative course of treatment in determining if their actions are disabling. *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

Courts in the Eighth Circuit have generally held that a regimen of prescription medicine, without more, constitutes a conservative course of treatment. *Kribble v. Kijakazi*, 663 F. Supp. 3d 1016, 1030 (E.D. Mo. 2023) (collecting cases in the context of migraines and physical impairments); *see Pierce v. Kijakazi*, 22 F.4th 769, 773 (8th Cir. 2022) (treatment consisting "primarily of narcotic pain medication" was a conservative course of treatment). The Court recognizes, however, that some courts have rejected a similar conclusion in the context of mental health treatment. *See Drawn v. Berryhill*, 728 F. App'x 637, 642 (9th Cir. 2018) ("[T]he ALJ improperly characterized Drawn's treatment as 'limited and conservative' given that she was prescribed a number of psychiatric medications.") (citation omitted); *Shelley C. v. Comm'r of Soc. Sec. Admin*, 61 F.4th 341, 363, 363 n.11 (4th Cir. 2023) ("A growing number of district courts have held that in cases where claimants consume antidepressant, anticonvulsant, and/or antipsychotic drugs, consistently attend visits with mental health professions, and endure constant medication adjustment and management, their treatment is classified as anything but 'routine and conservative.'") (collecting cases).

Here, rather than rely on a characterization of Plaintiff's mental health treatment, the Court considers the specifics of Plaintiff's course of treatment during the relevant period beginning on November 6, 2019, including his medical providers' recommendations. Notwithstanding the medications prescribed to treat Plaintiff's mental health conditions, on November 25, 2019, Butler only recommended therapy "as needed" (R. 631); on December 31, 2019, CNS Spooner-Falde recommended therapy, Wellbutrin, and a "happy light" (R. 622, 628); and on January 13, 2020, Plaintiff told Dr. Giffin that

he was "overall happy with things" when asked about his anxiety and had a normal affect (R. 621).

Further, from April 30, 2020 to November 17, 2020, Plaintiff continued with several therapy sessions with Butler, during which Plaintiff's mood and affect varied from normal and appropriate to flat and depressed, but Butler never recommended treatment beyond therapy "as needed," and Plaintiff reported that he thought his Lexapro was working.  (*See, e.g.*, R. 780 (April 30, 2020 appointment; appropriate mood and affect); R. 778 (May 1, 2020 appointment; appropriate affect and depressed mood); R. 776 (June 8, 2020 appointment; flat affect and depressed mood; Lexapro working); R. 774-75 (September 23, 2020 appointment; appropriate mood and affect; therapy as needed); R. 772-73 (October 13, 2020 appointment; appropriate affect and depressed mood; therapy as needed); R. 770-71 (October 27, 2020 appointment (appropriate mood and affect; therapy as needed); R. 769 (November 17, 2020 appointment; appropriate mood and affect; therapy as needed).)  From January 21, 2021 to May 27, 2022, Plaintiff apparently only saw medical providers relating to his suboxone treatment[42] without seeking out mental health treatment or behavioral interventions, at times had a stable mood and normal affect and at other times exhibited anxiety, started to exercise and participated briefly in a sober softball league, and was encouraged to seek out a "new

---

[42]     Plaintiff testified that he did not feel comfortable restarting with a new therapy provider after Butler left UFM and that he preferred a male therapist and only women were available.  (R. 184.)  Setting aside whether these explanations undermine his subjective complaints, nothing in the notes from Plaintiff's medication management visits suggests he wished to restart therapy but was not doing so for these reasons.

environment," engage in "more intense therapy," and "[c]ontinue to pursue community

and connection."  (R. 823-24 (January 21, 2021 appointment; mood stable, felt supported,

and starting to exercise; reported seeing IBH on a regular basis); R. 820-21 (February 19,

2021 appointment; some anxiety, including about outcome of social security hearing;

working on using treadmill; seeing IBH, but not recently); R. 816-18 (March 17, 2021

appointment; recent stress with court and social security, which did not go well; reported

more depression and panic; normal affect; conversant); R. 810-14 (May 4, 2021

appointment; recent stress with court and social security, which did not go well; reported

more depression and panic; reported feeling not social, avoiding interaction, afraid to

leave house/be social; normal affect; conversant); R. 805-08 (June 9, 2021 appointment;

"doing well," playing in sober softball league, which was "highly anxiety provoking, but

is getting easier"; normal affect; conversant; PA Presley recommended "more intense

therapy" and "[c]ontinue to pursue community and connection"); R. 800-03 (July 16,

2021 appointment; "took a pause from playing softball"; was anxious about dental work;

normal affect; conversant); R. 795-97 (September 3, 2021 appointment; reported

concerns about dental work; normal affect; conversant); R. 791-95 (October 1 2021

appointment; no reported or observed anxiety or depression; behavioral interventions

"not often"); R. 827-29 (November 5, 2021 appointment; depressed affect; appropriate

eye contact and speech); R. 833-35 (December 3, 2021 appointment; depressed affect;

appropriate eye contact and speech); R. 838-42 (February 7, 2022 appointment;

depressed affect; appropriate eye contact and speech); R. 844-47 (March 2, 2022

appointment; "Current behavioral interventions include none"; worried about mother's

health and other stressors at home; no observed anxiety or depression; PA Presley "emphasized the importance of a new environment and avoiding certain triggers"); R. 849-53 (May 27, 2022 appointment; no observed anxiety or depression).)

Not until September 26, 2022, did Plaintiff report an increase in anxiety and panic attacks, resulting in the Klonopin prescription and a recommendation to restart therapy. (R. 855.)  A month later, on October 26, 2022, Plaintiff reported that Klonopin was "helpful" and that he was taking his children to practice and a birthday party, notwithstanding external stressors including his mother's cancer diagnosis, concerns about a genetic predisposition to cancer, and the hearing scheduled for November 15, 2022.  (R. 862.)  PA Presley noted during the October 26, 2022 visit that a mental health therapy evaluation had been recommended for social security purposes.  (R. 862.)  At the evaluation with Hassan on November 3, 2022, Plaintiff reported severe issues with anxiety and depression, with a plan for him continue with a therapy session in one week. (R. 870.)

In sum, while at times Plaintiff exhibited anxiety, a depressed mood, and a flat affect during the relevant period, as the ALJ noted, "the record lacks evidence of hospitalizations or inpatient treatment related to the claimant's mental impairments during the relevant period."[43]  (R. 122.)  The ALJ did not err in relying on Plaintiff's

---

[43]    Although Javed recommended day treatment for Plaintiff in January 2019, 10 months before the November 6, 2019 disability onset date, Plaintiff said he could not go to day treatment until his daughter recovered from her heart surgery.  (R. 577-78.) Plaintiff apparently never began attending day treatment, and given the absence of any such recommendation after the November 6, 2019 disability onset date, the Court does not find this January 2019 recommendation undermines the ALJ's decision.

course of treatment constituting medication and off-and-on therapy in discounting his subjective complaints. *See Jennifer G. v. Kijakazi*, No. 20-CV-1197 (LIB), 2021 WL 6231437, at *8 (D. Minn. Sept. 29, 2021) (affirming ALJ's decision to discount subjective complaints relating to mental health based partly on the fact that plaintiff had "not had any psychiatric hospitalizations, has never been brought to the emergency room for an acute mental health exacerbations or panic attacks, has never been referred for partial hospitalizations or a day treatment").

The Court has considered both evidence that supports and contradicts the ALJ's conclusions with respect to Plaintiff's subjective complaints. *See Nash*, 907 F.3d at 1089. However, "it is not this Court's role to reweigh that evidence." *Schmitt v. Kijakazi*, 27 F.4th 1353, 1361 (8th Cir. 2022) (citing *Johnson v. Colvin*, 788 F.3d 870, 872 (8th Cir. 2015)); *Brandon O. K. v. Kijakazi*, No. 20-CV-2397 (JFD), 2022 WL 834515, at *5 (D. Minn. Mar. 21, 2022) ("The Court may not entertain requests to reweigh evidence.") (citations omitted). Instead, "[w]here substantial evidence in the record supports the ALJ's decision, a Court will not substitute its own judgment for that of the ALJ." *Brock O. K.*, 2022 WL 834515, at *5 (citing *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993))). Here, "a reasonable mind might accept" the evidence relied on by the ALJ, including Plaintiff's relatively normal mental status exams and the fact that his treatment during the relevant period never progressed beyond medication and was somewhat intermittent in terms of therapy, supports the ALJ's decision to discount the Plaintiff's

reports regarding his mental health symptoms.  The Court finds no error, legal or otherwise, in the ALJ's conclusion.

### 2.      "Stressful" versus "Non-Stressful" Settings

The Court turns to Plaintiff's argument distinguishing his mental status during the "non-stressful" setting of medical visits from his mental status and abilities in the "stressful" setting of a workplace.  (Dkt. 7 at 13-14; *see* Dkt. 10 at 4.)  This argument ignores the significance of Dr. Karayusuf's medical opinion and Dr. Kravitz's and Dr. Crandall's administrative findings.  Namely, a "medical opinion" is a statement about what a claimant "can still do despite [their] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions in the abilities listed," including "**ability to perform mental demands of work activities**, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting."  20 C.F.R. § 416.913(a)(2)(i)(B) (emphasis added).  In other words, Dr. Karayusuf's medical opinion considered Plaintiff's diagnosis, self-reports, and test results, and constituted an opinion as to his ability to work and restrictions in the workplace.  (R. 610.)  Similarly, the prior administrative findings of Dr. Kravitz and Dr. Crandall are findings as to Plaintiff's mental functioning "in a work setting" as to the Listings and the RFC.  20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(A)(2)(b) ("Paragraph B of each listing (except 12.05) provides the functional criteria we assess, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how your mental disorder limits your functioning.  These criteria represent the areas of mental functioning a person uses

in a work setting."); 20 C.F.R. § 416.945(a)(1) ("Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.").

Consistent with the law, Dr. Karayusuf, Dr. Kravitz, and Dr. Crandall reviewed Plaintiff's medical records when forming their opinions, and Dr. Karayusuf also considered Plaintiff's daily functioning and subjective complaints reported during the consultative examination.  (*See, e.g.*, R. 608-09 (Dr. Karayusuf's summary of records, functioning, and subjective complaints); R. 198-201 (Dr. Kravitz's summary of medical records, including Dr. Karayusuf's consultative examination, activities of daily living, and mother's function report, and explanation of PRT findings); R. 212-16 (Dr. Crandall's similar summary and explanation).)  They offered their opinions about Plaintiff's ability to work and limitations in a work setting based on that evidence.  The ALJ found Dr. Karayusuf's opinion was persuasive and Dr. Kravitz's and Dr. Crandall's administrative findings were "generally persuasive" (R. 121-22), and Plaintiff did not challenge the weight the ALJ assigned to those opinions and findings.  Consequently, as discussed below in Sections IV.B.1 and IV.C, the ALJ's conclusions as to the Listings and the RFC are supported by substantial evidence—including those medical opinion and prior administrative findings as to Plaintiff's ability to work.  Plaintiff cites no law

supporting his argument that the ALJ was required to do more to account for the difference in "stressful" and "non-stressful" situations.

## B.   Listings

The Court turns to Plaintiff's challenge to the ALJ's conclusion that he did not satisfy the criteria of Listings 12.04 Depressive, Bipolar and Related Disorders;[44] 12.06 Anxiety and Obsessive-Compulsive Disorders;[45] and 12.15 Trauma and Stressor-Related Disorders.[46]  Listing 12.00 recognizes 11 types of mental disorders that can constitute a

---

[44]     Depressive, Bipolar and Related Disorders in Listing 12.04 "are characterized by an irritable, depressed, elevated, or expansive mood, or by a loss of interest or pleasure in all or almost all activities, causing a clinically significant decline in functioning. Symptoms and signs may include, but are not limited to, feelings of hopelessness or guilt, suicidal ideation, a clinically significant change in body weight or appetite, sleep disturbances, an increase or decrease in energy, psychomotor abnormalities, disturbed concentration, pressured speech, grandiosity, reduced impulse control, sadness, euphoria, and social withdrawal."  20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(B)(3)(a).  This includes Major Depressive Disorder.  *Id.* at (12.00)(B)(3)(b).

[45]     12.06 Anxiety and Obsessive-Compulsive Disorders "are characterized by excessive anxiety, worry, apprehension, and fear, or by avoidance of feelings, thoughts, activities, objects, places, or people.  Symptoms and signs may include, but are not limited to, restlessness, difficulty concentrating, hyper-vigilance, muscle tension, sleep disturbance, fatigue, panic attacks, obsessions and compulsions, constant thoughts and fears about safety, and frequent physical complaints."  *Id.* at (12.00)(B)(5)(a).  This includes Generalized Anxiety Disorder and Panic Disorder.  *Id.* at (12.00)(B)(5)(b).

[46]     Trauma and Stressor-Related Disorders in 12.15 "are characterized by experiencing or witnessing a traumatic or stressful event, or learning of a traumatic event occurring to a close family member or close friend, and the psychological aftermath of clinically significant effects on functioning. Symptoms and signs may include, but are not limited to, distressing memories, dreams, and flashbacks related to the trauma or stressor; avoidant behavior; diminished interest or participation in significant activities; persistent negative emotional states (for example, fear, anger) or persistent inability to experience positive emotions (for example, satisfaction, affection); anxiety; irritability; aggression; exaggerated startle response; difficulty concentrating; and sleep disturbance."  *Id.* at (12.00)(B)(11)(a).  This includes PTSD.  *Id.* at (12.00)(B)(11)(b).

disability for purposes of social security benefits.  20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(A)(1).  Listings 12.04, 12.06, and 12.15 each have three subparagraphs: A, B, and C.  *Id.* at (A)(2).  To meet one of these Listings, a claimant must satisfy either Paragraphs A and B or Paragraphs A and C.  *Id.*  Paragraph A lays out the medical criteria that the claimant must present in his medical evidence, requiring "objective medical evidence from an acceptable medical source to establish that you have a medically determinable mental disorder."  *Id.* at (A)(2)(a), (C)(1).  There is no dispute that Plaintiff satisfied Paragraph A.

Before addressing Plaintiff's specific Paragraph B and Paragraph C challenges, the Court addresses Plaintiff's challenge to how the ALJ treated Dr. Karayusuf's "findings" and "test results."  (*See, e.g.*, Dkt. 7 at 12 ("While the ALJ did note the testing of memory and recall completed during Dr. Karayusuf's consultative examination of Mr. [F. Z.] revealed he had poor immediate digital recall, the ALJ gave little weight to this testing.") (citations omitted); *id.* at 13 ("In making his finding that Mr. [F. Z.] only had a 'moderate limitation' in his ability to 'understand, remember or apply information the ALJ gave little weight to the diagnostic findings of Dr. Karayusuf and other evidence in the record as a whole."); *id.* at 15 ("Dr. Karayusuf, in his consultative exam, found Mr. [F. Z.] should be restricted to 'work that involves brief, superficial, infrequent interactions with fellow workers, supervisors and the public' the ALJ diminished the weight of this finding by relying of Dr. Karayusuf's observations regarding Mr. [F. Z.'s] demeanor during the consultative examination.") (citation omitted).)  It appears that Plaintiff is confusing **test**

**results**, e.g., his inability to subtract serial 7s and that his "immediate digit recall was not

good" (R. 609), with Dr. Karayusuf's **medical opinion** as to Plaintiff's limitations that:

> He is able to understand, retain and follow simple instructions. He is
> restricted to work that involves brief, superficial, infrequent interactions with
> fellow workers, supervisors and the public. Within these parameters and in
> the context of performing simple, routine, repetitive, concrete, tangible tasks,
> he is able to maintain pace and persistence. He is able to manage benefits.

(R. 610).

"A medical opinion is a statement from a medical source about what you can still

do despite your impairment(s) and whether you have one or more impairment-related

limitations or restrictions in the abilities listed in paragraphs (a)(2)(i)(A) through (D) and

(a)(2)(ii)(A) through (F) of this section." 20 C.F.R. § 416.913(a)(2). Plaintiff's result on

any individual test administered by Dr. Karayusuf is not a medical opinion under the

regulations. Rather, tests results are evidence that the ALJ considers when determining

what weight to assign Dr. Karayusuf's medical opinion, including whether the opinion is

"support[ed]" by "objective medical evidence." *See* 20 C.F.R. § 416.920c(c)(1).

Here, the ALJ found Dr. Karayusuf's "opinion is supported by the consultative

examination" that Dr. Karayusuf performed, where the examination included the

administration of the immediate digit recall test, the serial 7s test, and other tests. (R.

122.) Based on the opinion's supportability, and because Dr. Karayusuf's opinion was

"mostly consistent with the objective medical evidence, including mental status

examinations and the claimant's longitudinal treatment history," the ALJ found that Dr.

Karayusuf's opinion was "persuasive." (R. 122.) Again, Plaintiff did not challenge the

weight the ALJ assigned Dr. Karayusuf's opinion as to what his limitations were and the

type of work he could do.  Rather, he asserts that the ALJ's conclusions as to the Listings

and RFCs were inconsistent with specific test results.  The Court therefore does not

disturb the ALJ's finding that Dr. Karayusuf's opinion was persuasive.

### 1.    Paragraph B

Paragraph B lists areas of mental functioning used in a work setting in order to

assess the claimant's functioning.  20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(F)(1).  The

four areas of functioning are: 1) understand, remember, or apply information; 2) interact

with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.  *Id.*

at (E)(1)-(4).  The Listings use a five-point rating system to define a claimant's

functioning in these four areas: no limitation; mild limitation; moderate limitation;

marked limitation; and extreme limitation.  *Id.* at (F)(2)(a)-(e).  A moderate limitation is

defined as: "Your functioning in this area independently, appropriately, effectively, and

on a sustained basis is **fair**."  *Id.* at (F)(2)(c) (emphasis added).  A marked limitation is

defined as: "Your functioning in this area independently, appropriately, effectively, and

on a sustained basis is **seriously limited**."  *Id.* at (F)(2)(d) (emphasis added).  And an

extreme limitation is defined as: "You are **not able** to function in this area independently,

appropriately, effectively, and on a sustained basis."  *Id.* at (F)(2)(e) (emphasis added).

To satisfy Paragraph B, the claimant's mental disorder must result in either an extreme

limitation in one of the four areas or a marked limitation in two of the four.  *Id.* at (F)(2).

It is the claimant's burden to prove they are disabled.  *Lochner v. Sullivan*, 968 F.2d 725,

727 (8th Cir. 1992); *see also Cronin v. Saul*, 945 F.3d 1062, 1066 (8th Cir. 2019) (noting

that the claimant "bears the burden at step three of showing that his impairments meet or

equal an impairment described in the listings") (citation omitted).

Beginning with the Paragraph B criteria, the ALJ found Plaintiff to have a moderate limitation in understanding, remembering or applying information; a marked limitation in interacting with others; a moderate limitation in concentrating, persisting or maintaining pace; and a moderate limitation in adapting or managing oneself, and thus did not satisfy that Paragraph.  (R. 117-18.)  Plaintiff argues that "[t]he substantial evidence in the record as a whole supports a finding that [Plaintiff] had a marked to extreme limitation in all four areas listed in Paragraph B."  (Dkt. 7 at 21-22.)

At the start, it is worth highlighting that neither Dr. Kravitz and Dr. Crandall opined that Plaintiff had a marked or extreme limitation in any of the four areas.  Instead, they both concluded that Plaintiff had a mild limitation in his ability to understand, remember, or apply information; a moderate limitation in his ability to interact with others; a moderate limitation in his ability to concentrate, persist, or maintain pace; and a moderate limitation in his ability to adapt or manage oneself.  (R. 200, 214.)  The degree of limitation found by the ALJ, after considering "the evidence in the light most favorable to the claimant, including his testimony at the hearing and statements made in his Function Report," is greater than that found by Dr. Kravitz and Dr. Crandall.  (R. 122; *see also* R. 117-18 (discussing PRT findings in detail).)  Similarly, Dr. Karayusuf did not opine that Plaintiff had the degree of limitation asserted by Plaintiff.  (*See generally* R. 608-11.)  With this in mind, the Court turns to the individual areas of functioning.

### a.  Understand, Remember, or Apply Information

Plaintiff first disputes the ALJ's determination of a moderate limitation in his

77

ability to understand, remember or apply information.  (Dkt. 7 at 11-14.)  Plaintiff argues

that he had a marked or extreme limitation in this area.  (*Id.*)

In finding a moderate limitation in this area, the ALJ acknowledged that Plaintiff's

"immediate digit recall was not good," but also noted that Plaintiff had "intact recent and

remote memory."  (R. 117.)  The ALJ further noted Dr. Karayusuf's opinion that Plaintiff

could "understand, retain, and follow simple instructions."  (R. 117.)  The ALJ further

relied on the "mostly unremarkable findings" on mental status examination, including

Plaintiff's display of "appropriate comprehension and expression, intact memory, average

intelligence, and an intact fund of knowledge."  (R. 117.)  Plaintiff argues that "[t]he

impairments in immediate digital recall" observed by Dr. Karayusuf support a finding of

marked limitation.  (Dkt. 7 at 13.)  This ignores the fact that Dr. Karayusuf did not find a

marked limitation after conducting the very tests that Plaintiff relies on, and essentially

asks the Court to reweigh the evidence and disregard Dr. Karayusuf's opinion in favor of

Plaintiff's own interpretation of the test results.  It also asks the Court to disregard the

fact that neither state agency consultant found a marked limitation even after considering

Dr. Karayusuf's report.  (*See* R. 199-206 (Dr. Kravitz's PRT findings); R. 213-19 (Dr.

Crandall's findings).)  Not only does the Court find Plaintiff's selective reliance on these

test results unpersuasive, the Court also declines Plaintiff's invitation to reweigh the

evidence.  *See Schmitt*, 27 F.4th at 1361.  And for the reasons explained in Section

IV.A.2, Plaintiff's argument that "the ALJ failed to account for how Mr. [F. Z.'s] general

anxiety disorder and panic disorder impairs his ability to 'apply information' as described

in 12.00E1" (Dkt. 7 at 13-14) is not supported by the law or the record.  The Court finds

the ALJ's conclusion as to Plaintiff's limitations in this area supported by substantial evidence, including Dr. Karayusuf's opinion, Dr. Kravitz's and Dr. Crandall's administrative findings, Plaintiff's mental status exams during the relevant period, and Plaintiff's course of treatment.

### b. Interact with Others

Plaintiff next challenges the ALJ's finding that Plaintiff had a marked limitation in interacting with others.  (Dkt. 7 at 14-17; Dkt. 10 at 5-6.)  The ALJ relied on Dr. Karayusuf's opinion, while noting Dr. Karayusuf's observations of Plaintiff's mental status during the examination; mental status exams during the relevant period; and Dr. Kravitz's and Dr. Crandall's administrative findings of a moderate limitation in this area. (R. 117-18.)

Plaintiff first argues that the ALJ's finding of a "marked" rather than "extreme" limitation in this area "diminishe[s]" Dr. Karayusuf's opinion that Plaintiff "is restricted to work that involves brief, superficial, infrequent interactions with fellow workers, supervisors and the public" and is inconsistent with the ALJ's RFC limiting Plaintiff to "no interaction with the public, with occasional interaction with coworkers and supervisors."  (Dkt. 7 at 14-15, 16-17.)  These arguments fail for several reasons.

First, "[t]he RFC analysis is different than the Step Three analysis."  *Hosch v. Colvin*, No. C15-2014-CJW, 2016 WL 1261229, at *5 (N.D. Iowa Mar. 30, 2016).  The SSA has made this point explicitly, stating "the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment . . . ."  SSR 96-8p, 1996 WL 374184, at *4.  "As a practical matter, . . . the different steps serve distinct purposes, the

degrees of precision required at each step differ, and our deferential standard of review

precludes us from labeling findings as inconsistent if they can be harmonized."

*Chismarich*, 888 F.3d at 980 (citing *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir.

2006) ("Each step in the disability determination entails a separate analysis and legal

standard.")).  "[A] court should aim to harmonize the ALJ's findings and 'neither pick

nits nor accept an . . . invitation to rely upon perceived inconsistencies.'"  *Chao V. v.*

*Saul*, No. 18-CV-1734 (HB), 2019 WL 4691254, at *6 (D. Minn. Sept. 26, 2019)

(quoting *Chismarich*, 888 F.3d at 980).

Second, turning to any alleged inconsistency, an extreme limitation is defined as:

"You are **not able** to function in this area independently, appropriately, effectively, and

on a sustained basis."  20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(F)(2)(e) (emphasis

added).  Neither Dr. Karayusuf nor the RFC included a limitation that Plaintiff could not

interact with others **at all**.  Rather, they both indicated that Plaintiff could interact with

others, albeit on a limited basis, which is not inconsistent with the ALJ's finding of a

"marked" limitation (and thus "seriously limited") at step three.  The Court rejects

Plaintiff's argument to the extent it is based on an alleged inconsistency between a

marked limitation at step three and the RFC or Dr. Karayusuf's opinion.  *See Verbois v.*

*Berryhill*, No. CV 18-629-RLB, 2019 WL 3936444, at *8 (M.D. La. Aug. 20, 2019)

(rejecting plaintiff's argument "that there is an 'apparent contradiction' in the ALJ's

finding that Plaintiff's ability to interact with others is moderately impaired at Step 3, but

that Plaintiff was limited to 'work that is essentially isolated with no interaction with the

general public and co-workers' in his RFC assessment").

Third, Plaintiff challenges the ALJ's reliance on his mental status during Dr. Karayusuf's examination; the ALJ's characterization of the record with respect to Plaintiff's anxiety disorder and panic disorder with agoraphobia as containing "mostly unremarkable findings"; and the ALJ's treatment of his GAD scores, Adult Function Report, and self-reports to Hassan during his November 11, 2022 psychiatric evaluation. (Dkt. 7 at 16.)  But as discussed in Section IV.A.1, the ALJ explained why he disregarded Plaintiff's subjective complaints, and the Court finds substantial evidence to support this decision.  Further, as discussed in that same Section, Plaintiff's mental status exams (including Dr. Karayusuf's) were mostly normal.  To the extent Plaintiff at times exhibited a depressed, anxious, or flat affect or mood, Plaintiff cites no evidence in the record that would support a total inability to interact with others in a work setting.  Rather, Plaintiff was repeatedly described as cooperative, pleasant, and appropriate during medical visits.  (*E.g.*, R. 621, R. 625, R. 630, R. 631, R. 769, R. 771, R. 773, R. 774, R. 780, R. 875.)  Substantial evidence supports the ALJ's conclusion that "during the relevant period reflect mostly unremarkable findings, indicating the claimant was pleasant and exhibited an appropriate mood and affect, appropriate and cooperative behavior, and spontaneous, logical, and coherent speech."  (R. 117.)  Moreover, "Plaintiff's ability to interact with [his] doctors, which necessarily involves cooperating with others, asking for help, and understanding and responding to request and suggestions, is thus illustrative of [his] ability to interact with others."  *Nova v. Comm'r of Soc. Sec.*, Civil Action No. 19-18145 (ES), 2021 WL 1712262, at *6 (D.N.J. Apr. 30, 2021).

Finally, Plaintiff argues that "a finding of extreme limitation would have been proper based on the medical evidence in the record as a whole." (Dkt. 7 at 14.) But the question is not whether the ALJ (or this Court) could properly find an extreme limitation in this area; the question is whether the ALJ's finding of a marked limitation is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (holding that a court "may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome" and "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner") (cleaned up). Here, the ALJ's conclusion as to Plaintiff's limitations in this area are supported by substantial evidence, including Dr. Karayusuf's opinion, Dr. Kravitz's and Dr. Crandall's administrative findings, Plaintiff's mental status exams during the relevant period, and Plaintiff's course of treatment.

### c. Concentrate, Persist, or Maintain Pace

Plaintiff challenges the ALJ's finding of a moderate limitation in concentrating, persisting, or maintaining pace. (Dkt. 7 at 17-19; Dkt 10 at 6.) The ALJ relied on Dr. Karayusuf's opinion, while noting Dr. Karayusuf's observations of Plaintiff's mental status and Plaintiff's individual test results during the examination; mental status exams during the relevant period; and Dr. Kravitz's and Dr. Crandall's administrative findings of a moderate limitation in this area. (R. 118.)

The Court begins with Plaintiff's somewhat remarkable argument that the ALJ's statement that Plaintiff "exhibited no apparent psychomotor abnormalities, no indication

of psychosis, organized and goal-directed thought processes, no delusions or paranoia, no suicidal or homicidal ideations, and normal concentration and attention" means the ALJ erroneously considered "the unrelated condition of Schizophrenia Specturm [sic] and Other Psychotic Disorders (12.03)," requiring remand.  (Dkt. 7 at 18 (citing R. 118).) While psychosis, delusions, and paranoia may not be specifically identified as "[s]ymptoms and signs" in Listings 12.04, 12.06, and 12.15, the "[s]ymptoms and signs" as to those Listings "may include, but are not limited to, . . . ," thereby demonstrating the identified symptoms and signs are not exhaustive.  20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(B)(3)(a), (5)(a), (11)(a).  Further, the absence of psychosis, delusions, and paranoia is plainly relevant to Plaintiff's ability to concentrate, and having reviewed the ALJ's thorough decision, the Court has no question that the ALJ considered the proper Listings in connection with Plaintiff's claim.

Plaintiff also argues that the ALJ's finding of a moderate limitation in his ability to "concentrate, persist or maintain pace" is inconsistent with the ALJ's RFC determination that he is limited to "simple and repetitive tasks in a routine work setting, performed in a work environment with no assembly line work or work that requires hourly quotas." (Dkt. 7 at 19.)  As explained above, this type of argument ignores the distinction between the step three and RFC analysis.  Further, "[a] limitation in mental functioning such as concentration, persistence, and pace need not be identically reflected in the RFC assessment."  *Eric E. A. v. Kijakazi*, No. 2:20-09558 ADS, 2022 WL 22234648, at *3 (C.D. Cal. Sept. 2, 2022)  Plaintiff does not identify any evidence in the medical record that would support a marked or extreme limitation in his ability to concentrate, persist, or

maintain pace; rather, he again makes a generalized argument based on his subjective complaints and disagreement with the ALJ's characterization of his mental status exams. The Court finds those arguments unpersuasive for the same reasons as those given with respect to Plaintiff's ability to understand, remember, or apply information and interact with others. The ALJ's reliance on Dr. Karayusuf's opinion that Plaintiff could maintain pace and persistence in the context of performing simple, routine, repetitive, concrete, tangible tasks and Dr. Kravitz's and Dr. Crandall's finding of moderate limitation in this area constitutes substantial evidence supporting a moderate limitation.

### d. Adapt or Manage Oneself

Finally, Plaintiff challenges the ALJ's finding that Plaintiff had a moderate limitation in adapting or managing oneself. (Dkt. 7 at 19-22; Dkt. 10 at 6-7.) In making his determination, the ALJ relied on Plaintiff's reports that he is able to care for his daughter and complete household tasks and chores, as well as the "mostly unremarkable findings" in the objective medical evidence, the observations of Dr. Karayusuf, and the opinions of the state agency consultants. (R. 118.)

Plaintiff cites two sets of "psychotherapy notes from [his] therapy sessions [that] note his inability to adapt to change and that he experiences extreme anxiety and panic attacks at any sign of stress." (Dkt. 7 at 20 (citing R. 623 (December 31, 2019 appointment; R. 740-44 (August 22, 2018 appointment).) One set of notes is from August 22, 2018, and predates the relevant period, which began on November 6, 2019, by over a year. The Court does not find notes from 14 months before the relevant period persuasive in this regard.

As to the December 31, 2019 treatment notes authored by CNS Spooner-Falde, it is unclear why Plaintiff thinks they undermine the ALJ's finding. During that visit, Plaintiff reported anxiety but also reported no: difficulty falling asleep, excessive feelings of guilt, lack of energy, or poor concentration. (R. 626.) As to anxiety, Plaintiff reported excessive worries or feelings of nervousness ongoing. (R. 626.) His mood was primarily "depressed and anxious," but he was "less dysphoric and feeling more optimistic." (R. 625.) He was casually dressed and groomed, pleasant, and cooperative. (R. 625.) His speech was spontaneous, logical and coherent, of a mostly normal rate and tone, non-pressured, organized, and reasonably responsive to interview questions. (R. 625.) His affect was appropriate to content of speech and circumstances. (R. 625.) These observations and subjective reports hardly suggest that Plaintiff was seriously limited or unable to adapt or manage himself.

Plaintiff also argues that the "evidence in Mr. [F. Z.]'s Functional Adult Reports, together with the medical evidence in the record and psychotherapy notes also support a finding Mr. [F. Z.] has a marked to extreme limitation in his ability to adapt and manage himself." (Dkt. 7 at 21.) As discussed above, the ALJ's decision to discount Plaintiff's subjective complaints is supported by substantial evidence. And this argument again fails to recognize that the question is whether the ALJ's finding of a moderate limitation in this area is supported by substantial evidence, not whether the Court could or would make a different decision based on the record. In view of Dr. Karayusuf's opinion, Dr. Kravitz's and Dr. Crandall's finding of moderate limitation in this area, and the multiple treatment notes documenting Plaintiff as oriented, alert, groomed, and casually dressed,

the Court finds substantial evidence supports the moderate limitation found by the ALJ in this area.

<p align="center">* * *</p>

In sum, the ALJ's conclusions as to Paragraph B are supported by substantial evidence.

## 2.    Paragraph C

Next, the Court turns to Plaintiff's challenge as to Paragraph C. Paragraph C is used to evaluate "serious and persistent mental disorders." 20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(A)(2)(c). First, the claimant's mental disorder must be "serious and persistent," meaning there must be a medically documented history of the disorder for at least two years. *Id.* at (G)(2)(a). The claimant must also satisfy two additional subparts. *Id.* C1 requires evidence that the claim relies on ongoing medical treatment, therapy, psychosocial support, or a highly structured setting to diminish symptoms and signs of your mental disorder. *Id.* at (G)(2)(b). C2 is satisfied "when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment," where "'[m]arginal adjustment' means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." *Id.* at (G)(2)(c). All three prongs must be met to satisfy Paragraph C. *Id.* at (G)(2)(a).

Plaintiff challenges the ALJ's conclusion that the evidence is not consistent with a finding that Plaintiff has minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. (Dkt. 7 at 23.) The bulk of Plaintiff's

<p align="center">86</p>

argument relies on Plaintiff's challenge to the ALJ's finding as to his ability to adapt or manage himself (*id.* at 23), and the Court rejects that argument for the same reasons as those given in Section IV.B.1.d.

Plaintiff also argues that Dr. Schumacher's testimony that "I don't think [Plaintiff] has minimal capacity to adapt to changes in the environment, and that's part of the item number two of the C criteria" supports a conclusion that he satisfies C2.  (*Id.* at 23-24 (citing R. 164).)  This seriously misrepresents or misunderstands Dr. Schumacher's testimony, which the Court reproduces below:

> Q So, Doctor, I wanted to follow up and ask what your opinion is about whether or not [Plaintiff] met the criteria at paragraph C, whether or not his major depressive disorder or generalized anxiety disorder was, and panic attacks with agoraphobia would meet the definition of being a serious and persistent mental disorder?
>
> A Yeah, I think he probably meets that in number one for the C criteria. **I don't think that he meets item number two.**
>
> Q Okay. And why is that, particularly in the case of the panic disorder with the frequent panic attacks?
>
> A Yes. The main reason is it looks like he is able to deal with immediate family and some quarantining issues. I'm a little unclear on why he can't drive. Well, I don't know. The record doesn't help me understand why he can't drive. **I don't think he has minimal capacity to adapt to changes in the environment, and that's the part of item number two of the C criteria.**
>
> Q Okay. **And what specific things in the medical record or the other medical opinions from acceptable medical sources make you believe that he has the capacity, other than a minimal capacity, to adapt to changes in his environment?**
>
> A **Well, I don't see why he wouldn't.** The panic disorder is physical for that. There's no doubt about it. He's receiving some treatment for that. It would be ill advised for him to, for example, just isolate himself and stay at

home because the panic disorder would likely get worse. So I don't see anybody saying that. . . .

(R. 163-64 (emphases added).)

It is clear from this testimony that Dr. Schumacher did not think Plaintiff satisfied C2 and believed that Plaintiff's capacity to adapt to changes in the environment was more than minimal. The Court finds Plaintiff's argument based on Dr. Schumacher's testimony entirely unpersuasive.

For all of these reasons, the Court finds the ALJ's determination that Plaintiff did not satisfy C2 supported by substantial evidence.

## C.    Step Five

Finally, Plaintiff argues that the ALJ erred at step five "in concluding Mr. [F. Z.] possessed sufficient RFC, in light of his disabling conditions, to perform other work in the national economy." (Dkt. 7 at 24-26; Dkt. 10 at 7-8.) This argument is based on a challenge to the ALJ's RFC determination. (*See* Dkt. 7 at 24-25; Dkt. 10 at 7-8.) The Court therefore addresses the RFC challenge before turning to step five.

### 1.    Weight Assigned to Butler's Opinion

Plaintiff's RFC challenge repeats his arguments as to the Paragraph B criteria and also takes issue with the ALJ's finding that Butler's opinion was unpersuasive. (*See id.* at 24-36.) Butler opined that Plaintiff had marked or extreme limitations regarding his functioning. (R. 784-87; *see also* R. 790 (letter by Butler).) The Court begins with the ALJ's treatment of Butler's opinion.

The regulations set forth how an ALJ should determine the weight assigned to

each medical opinion. *See* 20 C.F.R. § 416.920c(a). For claims filed after 2017: "[An ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). When a medical source provides one or more medical opinions or prior administrative medical findings, the ALJ will consider those medical opinions or prior administrative medical findings from that medical source together using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant (including length and purpose of treatment and frequency of examinations, among other factors), (4) specialization, and (5) other factors (for example, when a medical source has familiarity with the other evidence in the claim). 20 C.F.R. § 416.920c(a), (c)(1)-(5). The most important factors an ALJ considers when the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. 20 C.F.R. § 416.920c(a).

The SSA has described supportability and consistency as follows:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 416.920c(c)(1)-(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's

supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5,844-01, 5,853, 2017 WL 168819 (Jan. 18, 2017); *see also* 20 C.F.R. § 416.920c(c)(1). "An ALJ's discussion of [a medical source's] treatment and examination notes reflects the ALJ's consideration of the supportability factor with respect to their opinions." *Stephanie B. v. Kijakazi*, No. CV 22-837 (JWB/DTS), 2023 WL 3394594, at *1 (D. Minn. May 11, 2023) (citation omitted); *Troy L. M. v. Kijakazi*, No. 21-CV-199 (TNL), 2022 WL 4540107, at *11 (D. Minn. Sept. 28, 2022) (addressing the consistency of the medical source's treatment records with the opinion provided as to functioning in conjunction to supportability). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5,844-01, 5,853; *see also* 20 C.F.R. § 416.920c(c)(2).

With this context in mind, the Court turns to the ALJ's consideration of Butler's opinion. The ALJ described Butler's conclusions regarding Plaintiff's limitations and ability to work in detail and acknowledged that Butler had the benefit of in-person examinations of Plaintiff. (R. 122-23.) However, the ALJ found Butler's opinion to be unpersuasive because "his treatment notes do not include psychiatric findings that support the level of limitation opined" and because it was "not consistent with the objective medical evidence, including mostly unremarkable mental status examinations, [Dr. Karayusuf's] examination, and the claimant's longitudinal treatment history." (R. 123.) Plaintiff argues that "[h]ad Mr. Butler's medical opinion and the other medical evidence in the record been given appropriate weight by the ALJ, it would have supported a conclusion that Mr. [F. Z.] lacked the residual functional capacity to hold any

job in the national economy." (Dkt. 7 at 26.) The Court has discussed Plaintiff's longitudinal treatment history and Plaintiff's mental status exam results during the relevant period at length in this Order, and will not repeat itself here. Plaintiff did not identify anything in Butler's treatment notes that support the limitations opined by Butler, and it appears Plaintiff is relying on his subjective reports to Butler. As already explained, the ALJ's decision to discount Plaintiff's subjective complaints was supported by substantial evidence. Similarly, the ALJ's decision to discount Butler's opinion in view of Plaintiff's course of mental health treatment, which included therapy and medication, but no inpatient or hospitalization; Plaintiff's mental status exams, which were mostly normal except for a depressed, anxious, or flat affect or mood during some, but not all visits; and Dr. Karayusuf's opinion is supported by substantial evidence.

## 2. RFC

Finally, the Court turns to the RFC itself. An RFC is a measurement is based on a claimant's ability to do "sustained work-related physical and mental activities in a work setting on a regular and continuing basis," meaning 8 hours a day for five days week or an equivalent schedule. SSA 96-8p, 1996 WL 374184, at *1. It is intended to quantify the "most [a claimant] can still do despite [their] limitations." *Id.*; 20 C.F.R. § 416.945. An RFC is an "administrative assessment," not a medical assessment, despite drawing on medical sources. *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016) (citation omitted); *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (citations omitted) (quoting *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007)). "[I]t is not the diagnosis that becomes part of the RFC, instead the RFC describes a Plaintiff's capabilities and limitations as a

result of medical conditions." *Long M. v. Berryhill*, No. 18-CV-862 (ECW), 2019 WL 2163384, at *7 (D. Minn. May 17, 2019) (cleaned up). Indeed, the fact "[t]hat a claimant has medically-documented impairments does not perforce result in a finding of disability." *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004) (citing *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996)).

A disability claimant has the burden to establish his RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (*citing Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)) (cleaned up). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers*, 721 F.3d at 526; *Perks*, 687 F.3d at 1092-93). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527) (cleaned up). However, "statements about your pain or other symptoms will not alone establish that you are disabled." 20 C.F.R. § 416.929.

Here, the ALJ's decision to discount Plaintiff's subjective complaints and Butler's opinions are supported by substantial evidence. The Court further finds that the RFC's

limitations are supported by Dr. Karayusuf's opinion, Dr. Kravitz's and Dr. Crandall's administrative findings, Plaintiff's relative normal mental status examinations, and Plaintiff's course of treatment—which, whether "conservative" or not, never constituted more than medications and some outpatient therapy during the relevant period. This is more than sufficient to constitute substantial evidence to support Plaintiff's RFC. *See Palmer v. Colvin*, No. 6:16-CV-00223-NKL, 2017 WL 26908, at *12 (W.D. Mo. Jan 3, 2017) (finding the opinions of a consulting examiner and two state agency consultants, consistent with the medical record, constituted substantial evidence despite a conflicting treating physician's opinion).

The VE testified that a person with Plaintiff's RFC could perform the jobs of dishwasher; equipment washer; or warehouse worker roles relied on by the ALJ in the decision. (R. 189-90.) This testimony constitutes substantial evidence supporting the ALJ's decision at step five that Plaintiff is not disabled. *Treischel v. Astrue*, No. CIV. 11-242 JJK, 2012 WL 473467, at *7 (D. Minn. Feb. 14, 2012) ("Testimony from a VE in response to an ALJ's properly phrased hypothetical question constitutes substantial evidence satisfying this fifth step.") (citing *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001)).

In sum, the Court rejects Plaintiff's challenge to the RFC and to the ALJ's determination at step five.

\* \* \*

For all of these reasons, the Plaintiff's request for remand is denied and the Commissioner's request that the Court affirm the ALJ's decision is granted.

# V.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Plaintiff Manuel Ray F. Z.'s request for remand in his SSA Brief in Support

of Complaint (Dkt. 7) is **DENIED**;

2.    Defendant's request that the Court affirm the Commissioner's decision in

his SSA Brief in Opposition to Complaint (Dkt. 9) is **GRANTED**; and

3.    Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINGLY**


DATED: March 21, 2025                *s/Elizabeth Cowan Wright*
                                     ELIZABETH COWAN WRIGHT
                                     United States Magistrate Judge